**SEMI-STEEL CASTING CO. OF ST. LOUIS
v. NATIONAL LABOR RELATIONS
BOARD.**

**WEBER et al. v. SAME.**

**Nos. 13343, 13344.**

Circuit Court of Appeals, Eighth Circuit.

March 13, 1947.

Rehearing Denied April 21, 1947.

Joseph T. Davis, of St. Louis, Mo., for petitioner Semi-Steel Casting Co. of St. Louis.

John W. Giesecke, of St. Louis, Mo. (Ackert, Giesecke & Waugh, of St. Louis, Mo., on the brief), for petitioners Benjamin Weber, James Ellis and Simon Birk.

Charles K. Hackler, Regional Atty., of Clayton, Mo. (Gerhard P. Van Arkel, Gen. Counsel, Morris P. Glushien, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Ida Klaus and Robert E. Mullin, Attys., all of Washington, D. C., N.L.R.B., on the brief), for respondent.

Before THOMAS, JOHNSEN, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

October 30, 1943, the Semi-Steel Casting Company of St. Louis and the International Molders and Foundry Workers Union of North America, Local No. 59, A. F. L., executed an agreement for a consent election for the certification of a representative of an appropriate bargaining unit among the employees of the company. The agreement was duly approved by the Regional Director of the National Labor Relations Board, and an election pursuant to its terms was held on November 4, 1943.

In the election agreement the company and the union agreed upon the employees constituting the unit appropriate for the purposes of collective bargaining and the time and place of the election, provided that the election should be by secret ballot, that it should be conducted under the supervision of the Regional Director of the Board in accordance with the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and the rules and regulations and customary procedures and policies of the Board, and that the decision of the Regional Director should be conclusive on any question raised by either party to the election and not covered by the agreement. The company was required to furnish to the Regional Director a list of eligible voters constituting the unit. The company and the union were each granted the right to station an equal number of observers at the polling place to assist in the conduct of the election, to challenge the eligibility of voters, and to verify the result. Objections to the conduct of the election and the determination of the result were to be filed by either party within five days after the closing of the polls. The Regional Director was required to investigate any objections filed, and upon completion of his investigation to issue his finding of the result of the election.

At the conclusion of the balloting the agent of the Regional Director in charge of the election and the authorized observers of the union and the company, present at the balloting, certified that the accounting and tabulating of ballots were fairly and accurately done and the secrecy of the balloting maintained; that the number of eligible voters was 129, the number of ballots cast 119, of which two were void; that of the 117 valid ballots cast and counted, 59 were for the union and 58 against it. The same parties also executed a certification on "conduct of the election" in which they affirmed that the balloting was fairly conducted, that all eligible voters were given the opportunity to cast their ballots in secret, and that the ballot box was protected in the interest of a fair and secret vote.

The ballot used in the election was furnished by the Board and was the standard form used in all Board elections. It was a single sheet of paper divided by horizontal lines into three sections. The top section contained in large type the heading:

United States of America,
National Labor Relations Board,
Official Ballot,

under which in typewriting was written: "To determine the representative, if any, for the purposes of collective bargaining for certain employees of Semi-Steel Casting Company, St. Louis, Missouri." The middle section contained the following directions to the voters:

"1. Mark an X in one square only.

"2. Fold your ballot to conceal the X and personally put it in the ballot box.

"3. If you spoil your ballot, return it to the Board's Agent and obtain a new one."

Across the top of the bottom section of the ballot was printed in large type: "Mark an 'X' in the square of your choice." This was followed by the question: "Do you desire to be represented by International Molders and Foundry Workers Union of North America, Local No. 59, AFL?" Immediately below this question were two blank squares. At the top of one the word "Yes" was printed and above the other the word "No." At the bottom of the ballot in large capital letters was the admonition: "This as a secret ballot and must not be signed." Of the two ballots which were rejected and not counted, one had an X marked in both the Yes and No squares. The other had no mark in either square, but the voter, George Flemings, had signed his name opposite the word No appearing over the No square on the ballot.

Objections challenging the ruling of the agent of the Regional Director in charge of the election on the validity of the rejected ballots were presented to the Regional Director by the company, were examined by the Director and denied on November 9, 1943, and the union was certified as the duly elected bargaining representative of the employees.

The company declined to recognize the union as the bargaining representative of its employees. Upon complaint of the union, proceedings were held before a trial examiner of the Board and before the Board, with the result that on March 14, 1946, the Board adopted the finding of the trial examiner that the company had engaged and was engaging in unfair labor practices within the meaning of section 8(5) and (1) of the Act by refusing to bargain collectively with the union which the Board found had been designated in the consent election as the representative of the company's employees. The Board's order requires the company to cease and desist from its unfair labor practices, to bargain with the union upon request, and to post appropriate notices. Employees of the company opposed to the union were denied the right to intervene in these proceedings. In No. 13,343 we are asked by the company and in No. 13,344 by the employees whose petition to intervene was denied to review and set aside the order of the Board. The Board in its answer asks that its order be enforced.

The company does not deny that it refused to bargain with the union following the Board's certification of the union as the representative of the employees for the purpose of collective bargaining. It seeks to justify its refusal on the grounds, (1) that the Regional Director's report of the election shows that the union was not the choice of a majority of the employees voting in the election, and (2) that the union does not now represent a majority of the employees of the designated unit.

In support of its petition the company contends: (1) that for the purpose of calculating the majority of votes in the election the Board was required to include all ballots cast whether valid or invalid, since in either case all ballots were cast by eligible voters participating in the election; and (2) that the ballot of George Flemings shows on its face that the voter intended to and did in fact cast his ballot against the union. If either of these contentions is accepted, the union did not receive a majority vote in the election. If both rejected ballots are counted, the total number

of votes in the election was 119; if only one, the total is 118. In either case the number of ballots constituting a majority of those cast is 60, whereas only 59 were in favor of the union. If the ballot marked with an X in both the "Yes" and "No" squares is not counted and the ballot cast by George Flemings is counted as a vote against the union, the result is that the votes for and against the union were equal in number, in each case 59, and the union was not the choice of a majority.

■ On the issue raised concerning the rejected ballots, the terms of the consent election agreement may not be ignored. The agreement is in the form customarily used by the Board. Its purpose is to guard against disputes concerning the conduct of elections, to provide for the prompt and final settlement of such controversies as may arise between the parties, and thus to minimize delay in the administration of the Act. Important in the effective use of the election agreement for the purposes stated are the provisions that the election shall be held in accordance with the National Labor Relations Act and with the policies, rules, and regulations of the Board, and that the decision of the Regional Director concerning questions not covered by the agreement shall be conclusive on the parties. On review the Board accepts the Regional Director's decision on all questions pertaining to the election, unless shown to be arbitrary or capricious or not in conformity with the policies of the Board and the requirements of the Act. No reason appears why the company should not be bound by the provisions of the election agreement to which it is a party. "To hold otherwise would permit an employer deliberately to ignore binding commitments embodied in a consent agreement; would open the door to subterfuges for hampering and delaying a final determination of a bargaining representative; and would tend to defeat, rather than to effectuate, the policies of the Act." Matter of Capitol Greyhound Lines, 49 N.L.R.B. 156, 159, enforced Sixth Circuit, 140 F.2d 754, 758, certiorari denied 322 U.S. 763, 64 S.Ct. 1285, 88 L.Ed. 1590. In this case the Board concluded that the company was bound by its agreement to accept the deci-

sion of the Regional Director on the issue raised with respect to the rejected ballots. It also concluded that the ruling of the Regional Director was in conformity with the policy of the Board adopted in the administration of the Act. Unless it can be said that the rules and regulations of the Board are contrary to the Act, its decision must stand.

■ The Board asserts that in determining the result of an election held for the selection of a bargaining representative it has uniformly followed the practice of calculating election results on the basis of the number of valid votes cast, citing Matter of Sorg Paper Co., 9 N.L.R.B. 136, 137; Matter of American Tobacco Co., Inc., 10 N.L.R.B. 1171, 1172. It followed its established policy in this case. We are unable to say that the Board's practice in this respect is not within the discretion vested in the Board by the Act. Whether the result of an election of a bargaining representative should be determined on the basis of the valid ballots or on the basis of all ballots cast at the election by eligible voters is, in the absence of a contrary provision in the Act, a question appropriate for decision by the Board whose special duty it is to administer the Act. The question is one of statutory interpretation on which the decision of the Board is to be accorded great weight. N.L.R.B. v. Hofmann, 3 Cir., 147 F.2d 679, 681, 682, 157 A.L.R. 1149; N.L.R.B. v. Hearst Publications, Inc., 322 U.S. 111, 131, 132, 64 S.Ct. 851, 88 L.Ed. 1170; Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 681, 64 S.Ct. 830, 88 L.Ed. 1007. It is also a question of Federal and not of local law. N.L.R.B. v. Hearst Publications, Inc., supra, 322 U.S. 111, pages 123, 124, 64 S.Ct. 851, 88 L.Ed. 1170. In determining the question of employee representation the Board under section 9(c) of the Act "may take a secret ballot of employees, or utilize any other suitable method". Since the section of the Act authorizing an election is silent as to procedure, the manner in which an election is to be conducted and the rules and regulations for the conduct of the election and necessary to assure finality in the result of the election are within the competence of the Board to

provide, subject to the principles of majority rule and secrecy of the ballot which the Act enjoins. Southern Steamship Co. v. N.L.R.B., 316 U.S. 31, 37, 62 S.Ct. 886, 86 L.Ed. 1246; N.L.R.B. v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704; N.L.R.B. v. Falk Corp., 308 U.S. 453, 458, 60 S.Ct. 307, 84 L.Ed. 396. "The principle of majority rule, however, does not foreclose practical adjustments designed to protect the election machinery from the ever-present dangers of abuse and fraud. * * * It is true that it is an unfair labor practice for an employer to refuse to bargain with a union only if that union was chosen by a majority of the voting employees. But the determination of whether a majority in fact voted for the union must be made in accordance with such formal rules of procedure as the Board may find necessary to adopt in the sound exercise of its discretion." N.L.R.B. v. A. J. Tower Co., 67 S.Ct. 324, 328.

■■■■ It is apparent, as the Board asserts, that if the choice of a voter cannot be definitely and certainly ascertained from his ballot he has in fact expressed no actual choice in the election, his ballot cannot .be reasonably classified as either an affirmative or a negative vote, and for these reasons the voter has contributed nothing to the result of the election. The Board's practice in determining the result of an election on the basis of the number of valid votes cast cannot be said to prejudice the rights of either party to the election. On the other hand, it seems reasonably designed to secure certainty and finality in elections and to determine the identity of the bargaining representative upon the free choice of the employees actually and clearly expressed at the polls. It is not unreasonable to say that the employee whose vote was marked both for and against the union did not in fact participate in the election. So far as can be ascertained from his ballot, he attended the polls merely to express his indifference to the result. His action contributed no more and no less to the determination of the choice of the majority of the employees than did the action of those eligible employees who did not vote. Concerning

Flemings' ballot, it is sufficient to say that his signature upon the ballot violated the express rules for secrecy under which the election was conducted and which were assented to by the company in the election agreement. Whether Flemings intended to vote for or against the union, it is impossible to say from an inspection of his ballot. To permit him to testify as to his intention in marking the ballot as he did would, as the Board asserts, effectively destroy the secrecy of the ballot which the Board's policy is designed to protect and which the Act commands. The reception of such evidence would also expose the employee to the hazard of union or employer coercion and thus imperil his freedom of choice of a bargaining representative. "To permit the counting of ballots which, regardless of specific instructions appearing thereon, nevertheless are signed or contain markings clearly identifying the voter, clearly would open the door to the exertion of influence such as to prevent the exercise of the voter's free choice." Matter of Burlington Mills, 56 N.L.R.B. 365, 368.

■■■■ The company argues that the order to bargain collectively with the union should not be enforced by this court because of the probable loss of the union's majority status as the result of an asserted turnover in personnel during the time which elapsed between the date of the election and the date of the Board's order. The election was held November 4, 1943, and the Board's order requiring the company to bargain with the union which it determined had received the majority vote at the election came down March 14, 1946. The evidence adduced by the company did not establish the fact, but only the probability of the loss of the union's majority status. But the union's loss of majority status, during the course of the proceedings before the Board on the charge of unfair labor practices against the company, if established, does not invalidate the order of the Board. The Board found that "any loss in the Union's majority status is attributable to the respondent's unlawful refusal to bargain." That the company did refuse to bargain with the union is admitted, and we hold that its refusal on the

.facts in this case was unlawful. It was therefore guilty of the unfair labor practice with which it was charged at the institution of these proceedings. In National Licorice Co. v. N.L.R.B., 309 U.S. 350, 362, 60 S.Ct. 569, 84 L.Ed. 799, the court said that the fact that a majority of employees had freely rejected their union designation did not militate against a finding by the Board that the union represented the employees when the employer refused to bargain. In Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020, it is held that the Board has power to order an employer to bargain with a union which has lost its majority status after petitioner wrongfully refused to bargain with it. "It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged." International Association of Machinists v. N.L.R.B., 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50; Medo Photo Supply Corp. v. N.L.R.B., supra, 321 U.S. p. 687, 64 S.Ct. 830, 88 L.Ed. 1007.

 Since this was an unfair labor practice proceeding against the company under section 10 of the Act, it is clear that the Board committed no error in refusing to permit employees opposed to the union to intervene. Section 10(b) provides the manner in which issue shall be joined in such proceedings. The Board is required to serve upon the person charged with engaging in an unfair labor practice a complaint stating the charges in that respect. The person charged is permitted to answer the complaint and to give testimony at the hearing of which the Board is required to give him notice of the time and place. "In the discretion of the member, agent or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony." The courts have uniformly held that in a proceeding under this section of the Act against an employer on the charge of unfair labor practices the employees are not necessary parties. Thus in N.L.R.B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307, the Board in an un-

fair labor practice proceeding ordered the employer to discontinue recognition of an association of its employees as the bargaining agent for its employees. It was contended that the association was a necessary party to the proceeding on the ground that its interests were involved. The court said: "As the order did not run against the Association it is not entitled to notice and hearing. Its presence was not necessary in order to enable the Board to determine whether respondents had violated the statute or to make an appropriate order against them." The order of the Board in this case is directed only against the company. The Board's power is effectively exercised upon no one else. The employees were not necessary parties to the proceeding, and there was no abuse of the Board's discretion in refusing to make them parties. National Licorice Co. v. N.L.R.B., supra, pages 362, 366 of 309 U.S., 60 S.Ct. 569, 84 L.Ed. 799; Oughton v. N.L.R.B., 3 Cir., 118 F.2d 486, 495, 496. Insofar as intervention was sought by the employees for the purpose of making the same defense as that made by the company, they were not only not necessary parties, but their presence could only serve to hinder and delay the prompt decision of the controversy. They make no showing that they could have adduced evidence other than that offered by the company. There is no merit in the claim that they were entitled as of right to have an observer at the election as a special representative of those employees who were opposed to the union. Whether either the company or the union or the employees opposed to the union are represented at the polls by observers is a matter exclusively within the discretion of the Board. None of the intervening employees requested representation by observers before the election. They had the same notice of the election as other employees and the same opportunity to vote. Nothing in the petition for leave to intervene or in the answer tendered with it tends to show that the Board's agents failed in their duty to conduct a fair election, or that the complaining employees were prejudiced by lack of representation, or that the election did not result in the choice of a bargain-

ing representative by the majority of those employees in the union who availed themselves of the privilege of attending the election and casting their ballots.

In Nos. 13,343 and 13,344 the petitions for review and reversal of the Board's order are denied. The petition of the Board for enforcement of its order is granted.