262 F.2d 933
 SHORELINE ENTERPRISES OF AMERICA, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Ruth DE PRATTER, Vera Mobley, Billie Traina, and Joe Diaz, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 16733.
 No. 16874.
 United States Court of Appeals Fifth Circuit.
 January 14, 1959.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Cody Fowler, Granville M. Alley, Jr., Tampa, Fla., Fowler, White, Gillen, Yancey & Humkey, Tampa, Fla., of counsel for Shoreline Enterprises of America, Inc.
 Andrew P. Carter, New Orleans, La., John A. Chilldon, Tampa, Fla., for petitioner Ruth DePratter.
 Stephen Leonard, Associate Gen. Counsel, Owsley Vose, Atty., N. L. R. B., Washington, D. C., Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Alice Andrews, Attys., National Labor Relations Board, Washington, D. C., for respondent.
 Before RIVES, JONES and WISDOM, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 Two petitions are before the Court to review a decision and order of the National Labor Relations Board.[1] In representation proceedings, after a consent election, the Board certified the International Union of United Brewery, Flour, Cereal, Soft Drinks and Distillery Workers of America, AFL-CIO as the exclusive bargaining agent of the employees of Shoreline Enterprises of America, Inc. of Tampa, Florida. On the complaint of the Union, in unfair labor practice proceedings, the Board found Shoreline guilty of refusing to bargain with the Union and issued a cease and desist order against Shoreline.
 
 
 2
 Shoreline attacks the certification of the Union and the resulting Board order, contending that the election was invalid and also that the Union was not in compliance with Section 9(h) of the National Labor Relations Act requiring union officers to file a non-communist affidavit before invoking the Act. Four Shoreline employees (Ruth De Pratter, Billie Traina, Vera Mobley, and Joe Diaz) had intervened in both the representation and the unfair labor practice proceedings. These Intervenors filed a petition to set aside the Board order on the ground that, although eligible, they were denied the right to vote in the election.[2] The Board cross-petitioned for enforcement of its order. The petitions are consolidated for purposes of review.
 
 
 3
 We set aside the order of the Board and remand the cases for proceedings not inconsistent with this opinion.
 
 I.
 
 4
 A somewhat detailed review of the facts and proceedings clarifies the issues.
 
 
 5
 February 14, 1955, after a campaign of ten weeks to organize Shoreline's employees, the Union filed a petition with the Board under Section 9(c) of the Act. The Union asked for an election to be held among Shoreline's employees to determine if it should be certified as the bargaining representative in a unit consisting of all production and maintenance employees, including refrigeration engineers, and excluding supervisors, clericals, and professional workers.
 
 
 6
 March 3, 1955, the Board held a representation hearing. The Company challenged the appropriateness of the proposed unit. One witness, Shoreline's plant manager, testified as to the various duties of the plant employees. He testified that De Pratter, Mobley, and Traina performed clerical duties, such as keeping records for time study or cost purposes of the time spent by each plant employee; that Traina, in addition, worked in the packaging room. The Company objected to these employees being included in the unit. The Union contended that these employees were "plant clericals" and "within the unit", but that it would "leave that determination to the Board". The plant manager testified that Diaz' time was "almost entirely devoted to driving the truck". At first the Union stated that it was "seeking to represent the truck driver". Then, after Shoreline's attorney objected that the Union's position constituted an amendment of its petition, the Union withdrew "its claim to the truck driver". While taking no position as to Diaz, the Company again objected. The Company was represented at the hearing by its attorney, Mr. Alley. Mr. Gerchak was the Union's representative. The Intervenors were not present at the hearing.
 
 
 7
 While these questions were pending before the Board, Alley and Gerchak held a conference March 21 under the auspices of the local office of NLRB. This resulted in Alley and Gerchak signing a "Stipulation for Certification upon Consent Election", a Board form.
 
 
 8
 Before executing the "consent election agreement", Alley and Gerchak again conferred as to the status of the Intervenors. At this meeting the Union and the Company reversed their positions as to the Intervenors' eligibility. The Company favored, the Union opposed, inclusion of the Intervenors. When it looked as if negotiations would break down, the Examiner asserted that if the parties could not reach agreement, the Board would determine the Unit. Alley telephoned Hice, a Vice President of Shoreline, that the Union was insisting on "excluding clericals and truck drivers", and that the "four employees [Intervenors] * * * would be unable to vote because that was their job classification". Alley then consented to the unit and to the exclusion of the Intervenors, as the Union requested.[3]
 
 
 9
 In accordance with usual Board procedure, Examiner West required that employees within the excluded classifications be stricken from the eligibility list to be used in the election. Alley inquired as to whether De Pratter, Mobley, Traina, and Diaz, "could be stricken from the list under the unit * * * agreed to". According to Alley, West, "was satisfied that these employees were excluded from the unit * * * agreed to" and were ineligible to vote. Their names were then stricken from the eligibility list which Alley and Gerchak signed.[4]
 
 
 10
 Before the election the Board agent in charge of the election gave voting instructions to the election observers and the representatives of the Company and the Union. According to De Pratter, present as an observer, the Board agent stated that she, Mobley, Traina, and Diaz were not to be allowed to vote; if they showed up at the polls they should be sent back to the plant. There is a dispute as to whether the agent went this far. Directly after the meeting, the Company's representative informed Traina that she could not vote.
 
 
 11
 The election was held April 4 and 5, 1955, under the supervision of an agent of the Board. There were 133 eligible voters. 114 votes were cast: 58 for the Union and 55 against the Union. One vote was challenged.[5] It was against the Union. The four Intervenors would have voted against the Union. So they alleged in affidavits. If three of the Intervenors had voted, a tie would have resulted and the Union could not have been certified. If only two had voted, the challenged vote would have been decisive.
 
 
 12
 Before the election Hice told De Pratter, Traina, and Diaz that they were ineligible to vote. At the pre-election meeting between the Company and Union representatives the Field Examiner had told De Pratter either (a) that she and the other intervenors could not vote or (b) that they were ineligible. The first day of the election Mobley went to the polls to vote. According to her testimony, the Field Examiner said that she could not vote; it "didn't make a darn bit of difference with him, but it wouldn't be counted". The Board agent stated that he informed Mobley of her rights. The report of the Regional Director, however, points out that "other voters received the impression that Mobley's vote would not be counted but would be simply wasted". De Pratter was present at the incident and corroborated Mobley's testimony. Mobley left the polls, returned to the plant, and told Traina that the Board agent had prevented her from voting. Traina then refrained from attempting to vote.
 
 
 13
 The day after the election, the Intervenors filed objections to the election, alleged their eligibility, and asked that the election be set aside. The day after this filing the Regional Director denied the Intervenors' objections.
 
 
 14
 April 11, Shoreline filed objections on the grounds that: (1) the Union had threatened and intimidated the employees; (2) paid organizers of the Union served as election observers; (3) the action of the Board resulted in four eligible employees not voting. In explanation of its third objection, Shoreline contended that its attorney, Alley, had been misled concerning the Intervenors' duties by statements of representatives of the Union and the Board. The Regional Director investigated, then recommended that the objections be overruled. He found that a substantial issue was raised as to the Board agent's responsibility for De Pratter and Mobley not voting, but concluded that the Company was not prejudiced since the Intervenors were not eligible. October 26, 1955, the Board certified the Union as the exclusive bargaining representative of all the employees. The Board found that since the Company had agreed to exclude the Intervenors, they were not eligible to vote, and that the Board need not determine the cause of their not voting.
 
 
 15
 November 5, 1955, ten days after certification of the Union, 102 of the 133 employees within the unit signed and filed a petition with the Company stating that "the union election * * * was not a fair election" because "De Pratter, Mobley, Traina, and Diaz were not allowed to vote". The signatories said that they "reject[ed] the Union as [their] agent".[6]
 
 
 16
 November 7, 1955, Shoreline gave a general wage increase of 5 cents to 15 cents an hour to all its employees without giving notice to the Union. Two months later the Union filed charges of unfair labor practice, alleging that the Company had unlawfully refused to bargain. February 14, 1956, the Board issued a complaint based on the Union's charges.
 
 
 17
 At the unfair labor practice hearing May 15, 1956, De Pratter, Mobley, Traina, and Diaz were allowed to intervene for the limited purpose of excepting to the election. The Trial Examiner found that all objections were without merit, and that Shoreline was guilty of an unfair labor practice in refusing to bargain with the Union.
 
 
 18
 At the hearing the Company challenged the Board's jurisdiction on the ground that at the time of the representation proceeding and thereafter the Union was not in compliance with Section 9 (h) of the Act, because of failure of the members of the Union's General Executive Board, Regional Director, and International Representatives to file the noncommunist affidavit. The day before the complaint was issued, however, the Union filed noncommunist affidavits for the members of its General Executive Board and its Regional Directors. The Trial Examiner held that the issue of noncompliance with Section 9(h) was nonlitigable in unfair labor practice proceedings, being a matter solely for the Board's administrative determination in separate proceedings.
 
 
 19
 The Board adopted the Trial Examiner's report, reaffirmed the validity of the certification, and held that the Company was guilty of unfair labor practices. The Board upheld the Examiner's refusal to consider union compliance in the unfair labor practice proceeding, but nonetheless decided that the Union was in compliance.
 
 
 20
 The order of the Board requires that the Company cease and desist from the unfair labor practices found and, affirmatively, requires the Company to bargain collectively with the Union.
 
 II.
 
 21
 Shoreline's objection to the Union's failure to file noncommunist affidavits in compliance with Section 9(h), 29 U.S.C.A. § 159(h), in large part, comes too late. Shoreline did not raise the issue in the representation proceedings. The objection was not made until Shoreline answered the complaint in the unfair labor practice proceeding. By that time the question was moot as to the members of the Union's General Executive Board and its Regional Directors, for these officials filed noncommunist affidavits the day before the issuance of the complaint. The question is not moot as to the International Representative.
 
 
 22
 This Court agrees with Shoreline that the issue of noncompliance is litigable in an unfair labor practice hearing, at least when the question turns on who is an "officer" within the meaning of Section 9 (h) of the Act and within the meaning of the Union constitution.
 
 
 23
 In N. L. R. B. v. Highland Park Mfg. Co., 1951, 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969 the Supreme Court allowed an employer to litigate compliance in an unfair labor practice proceeding over the Board's objection that compliance matters were solely administrative and not reviewable in the courts. In that case the Court held that the CIO and AFL were labor organizations within the meaning of Section 9(h) and that their officers were required to file noncommunist affidavits. After this decision, the Board still continued to deny the employer's right to litigate compliance, distinguishing Highland Park on the ground that there the Court determined only the "necessity of compliance", not the "fact of compliance". In N. L. R. B. v. Coca-Cola Bottling Co. of Louisville, 1956, 350 U.S. 264, 76 S.Ct. 383, 384, 100 L.Ed. 285, the Supreme Court rejected the attempted distinction as "too thin a dialectic enterprise". "Both Highland Park and this case", said the Court, "invoke the scope of § 9(h), the meaning to be derived from its language; neither case involves any inquiry into disputed facts, the situation referred to in Highland Park."
 
 
 24
 Coca-Cola Bottling Co. of Louisville revolved about the meaning of the term "officers". The Supreme Court approved the Board's definition of "officer" as any person "occupying a position identified as an office in the constitution of the labor organization", and remanded the case to the Board to consider evidence as to the functions of the CIO's Regional Director.
 
 
 25
 In Desaulniers and Co., 1956, 115 N.L. R.B. 1025, one of the Board's leading cases, and in other cases since Coca-Cola, the Board has persisted in applying the mechanical rule that Section 9(h) requires a filing only by persons labelled "officers" in union constitutions. In two circuits since the Coca-Cola decision the courts have taken a broader view. N. L. R. B. v. Eastern Massachusetts Street Railway Co., 1 Cir., 1956, 235 F.2d 700, certiorari denied 352 U.S. 951, 77 S.Ct. 325, 1 L.Ed.2d 242; N. L. R. B. v. Puerto Rico Food Products Corp., 1 Cir., 1956, 232 F.2d 515; Goodman Manufacturing Co. v. N. L. R. B., 7 Cir., 1955, 227 F.2d 465, dismissed by consent, 1956, 351 U.S. 901, 76 S.Ct. 692, 100 L.Ed. 1439, opinion withdrawn, judgment affirmed on new opinion, 7 Cir., 1956, 234 F.2d 775, certiorari denied United Electric Radio & Machine Workers of America v. Goodman Mfg. Co., 352 U.S. 872, 77 S.Ct. 94, 1 L.Ed.2d 77.
 
 
 26
 The First Circuit interprets Coca-Cola as abolishing entirely the distinction between the necessity of compliance and the fact of compliance. In N. L. R. B. v. Puerto Rico Food Products Corp. [232 F.2d 518] the Court stated that in Coca-Cola the Supreme Court "did not limit the question to the necessity for compliance, a matter of statutory construction, and hence a matter of law, but stated it broadly enough to embrace within its scope the fact of compliance as well." The Court allowed the employer to litigate the question of whether affidavits actually had been filed.
 
 
 27
 The Goodman case is very similar to the instant case. There the question of compliance depended on whether District Secretaries and Trustees were officers although their positions were not described in terms as offices. In its first opinion (227 F.2d 465, 469) the Seventh Circuit stated that courts ought not to inquire into disputes of fact, on the matter of compliance, but pointed out that there was no factual disagreement, "only a disagreement concerning the Board's conclusions from admitted facts". The first Goodman opinion was rendered before Coca-Cola Bottling Co. of Louisville. The second opinion, (234 F.2d 775, 776) states that "it now appears definitely settled that non-compliance with Sec. 9(h) may in an appropriate case be raised as a defense to an unfair labor practice complaint and that when so raised it is jurisdictional". An appropriate case is when the "question is whether `trustees' and `secretaries' occupy positions `identified' as an office in the [union] constitution".
 
 
 28
 The Board attacks these decisions: (1) as too sweeping in their effect compared with Coca-Cola's holding; (2) as overloading an overburdened Board, opening up a breadth of inquiries into extrinsic matters leading to submerging the merits in a welter of side issues, thereby impeding and delaying the real function of the Board. We say, as the Supreme Court said in Coca-Cola: "After Highland Park the argument comes too late." We say further that the administrative burdens are considerations for Congress. The statutory aim of 9(h) is clear and paramount to the convenience to the agency of applying a mechanical rule.[7]
 
 
 29
 It is not necessary for us to go as far as the First Circuit did in Puerto Rico Food Products. Shoreline is not seeking to litigate whether affidavits were actually filed, whether they are true or false, whether they are sufficient. As in Goodman the dispute concerns the Board's conclusions from its construction of the Union constitution. The litigation of "who is an officer" under the constitutional test should not be as time consuming as the Board-approved litigation of "whether an affiliated union is a labor organization" required to comply with Section 9. Standard Cigar Co., 1957, 117 N.L.R.B. 852.
 
 
 30
 If the Board's position were correct, a completely communist-run union could circumvent congressional objectives and obtain the benefits of the Act by the simple device of excising the words "office" and "officer" from its constitution or limiting the definition of "office" to certain innocuous positions filled by title-holders shorn of power and function. No doubt the Board could apply a functional test through administrative channels, but if the employer can not object and the Board will not object in an unfair labor practice proceeding the section of the statute Congress thought of as a barrier to communist unions receiving the benefits of the Act is a paper curtain.
 
 
 31
 The Court has taken some pains to satisfy itself that Shoreline may raise the issue of noncompliance, because the question is squarely before us. It is something of an anticlimax to hold, however, as the Court feels that it must hold, that Shoreline has failed to show that the noncomplying International Representative is an "officer" of the Union.
 
 
 32
 The President, Secretary-Treasurer, Director of Organization, and Coordinator of State Councils are undoubtedly "officers", because they meet even the Board's verbal test; the constitution calls them "officers". The members of the General Executive Board and the Regional Directors may be officers under the Coca-Cola test, as interpreted in Goodman, because their extensive powers and duties are described precisely and at length in the Union constitution and add up to the authority and functions associated with a man holding office. But there is a resounding silence in the Union constitution as to the powers and duties of an International Representative. The constitution says only that the Director of Organization may appoint and remove International Representatives at a salary not to exceed $6500. That is all. There is no telling what the International Representative is in the basic structure of the Union. Even if a functional test were applied and a hearing held, it would prove only the extent of the influence of the particular International Representative under investigation. It could not relate the office to this Union's hierarchy or to the organization of this Union. We hold that he is not an officer under the constitutional test accepted by the Supreme Court.
 
 III.
 
 33
 Shoreline carries a heavy burden in charging that union coercion prevented a fair election. "The burden [rests] not on the board to show that the election was fairly conducted but on the respondent to show that it was not." N. L. R. B. v. Huntsville Mfg. Co., 5 Cir., 1953, 203 F.2d 430, 433. Congress "entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees". N. L. R. B. v. A. J. Tower Co., 1946, 329 U.S. 324, 67 S.Ct. 324, 328, 91 L.Ed. 322.
 
 
 34
 There is evidence that pro-Union employees threatened pro-Company employees. These threats were made by employees who were not acting for the Union in any representative capacity.
 
 
 35
 In the cases the Company relies on where an election was upset because of conduct not attributable to a union or employer, the Board found such serious threats of physical violence and coercive conduct that "an atmosphere of fear and reprisal existed and that a free election was thereby rendered impossible." Poinsett Lumber and Mfg. Co., 1956, 116 N.L.R.B. 1732. In Diamond State Poultry Co. Inc., 1953, 107 N. L. R. B. 3 the Board found that the "election was held in such a general atmosphere of confusion and fear of reprisal as to render impossible the rational, uncoerced selection of a bargaining representative".
 
 
 36
 There was no such atmosphere here. Individual isolated verbal excesses do not warrant setting an election aside. Anti-union employees were outspoken in their views. N. L. R. B. v. Vulcan Furniture Mfg. Corp., 5 Cir., 1954, 214 F.2d 369, 372. See also N. L. R. B. v. Mylan-Sparta Co., 6 Cir., 1948, 166 F.2d 485, 490. Some pro-Union statements were neutralized by the Employer's contrary assurances. The Company observers themselves certified that the election was conducted in an orderly fashion with no untoward incident. Werman & Sons, Inc., 1953, 106 N.L.R.B. 1215.
 
 
 37
 We do not say that in this case the Board provided a "laboratory", as dreamed up in General Shoe Corp., 1948, 77 N.L.R.B. 124, in which a controlled experiment is conducted to "determine the uninhibited desires of the employees". Coercion cannot be calibrated. Giving weight to the Board's discretionary authority, and gauging the coercion as well as we can at this distance, we hold that Shoreline has not supported its charges with sufficient evidence to persuade us that the Board acted improperly in rejecting the objection relating to Union coercion.
 
 IV.
 
 38
 As for "the select[ion of] union officers or leaders" as election observers, this Court has held that it is not "a ground for invalidating the election". N. L. R. B. v. Huntsville Mfg. Co., 5 Cir., 1953, 203 F.2d 430, 433. See also Semi-Steel Casting Co. of St. Louis v. N. L. R. B., 8 Cir., 1947, 160 F.2d 388, 393, certiorari denied 332 U.S. 758, 68 S.Ct. 57, 92 L.Ed. 344.
 
 V.
 
 39
 The most serious question in this case concerns the right of individual employees to have a say in their own economic life.
 
 
 40
 We agree with the Board as to Shoreline. Shoreline and the Union entered into a written contract providing that the bargaining unit would consist of production and maintenance workers. The contract required Shoreline to furnish the Regional Director an "accurate list of all the eligible voters". Company and Union representatives discussed fully the Intervenors' eligibility, then signed the eligibility list, with the intention to bar the Intervenors from voting. If anyone was in a position to know or to become informed as to the extent of the Intervenors' production duties, it was Shoreline. Until the election results were announced, the Company was satisfied with the exclusion of the Intervenors.
 
 
 41
 The Board insists, and it should, that the parties respect a pre-election agreement resolving eligibility questions. Stanley Aviation Corp., 1955, 112 N.L. R.B. 461. Shoreline contends that the Board policy expressed in Stanley has been narrowed so that a pre-election agreement is binding as to eligibility only if there is an express provision that issues of eligibility resolved in the agreement shall be final and binding upon the parties. O. E. Szekely & Associates, Inc., 1957, 117 N.L.R.B. 42; Norris-Thermidor Corp., 1958, 119 N.L. R.B. 155. The agreement in this case did not contain such a provision.
 
 
 42
 The basic policy — we endorse it — is that a company and a union must be held to their agreements, as any other party is held to an agreement. In cases involving a pre-election resolution of eligibility issues between a company and union it is especially important to hold the parties to their contract. To permit either to repudiate a pre-election agreement and redetermine the eligible members of a bargaining unit, after an election has been held, would enfeeble the consent election procedure. Semi-Steel Casting Co. of St. Louis v. N. L. R. B., 8 Cir., 1947, 160 F.2d 388, certiorari denied 332 U.S. 758, 68 S.Ct. 57, 92 L.Ed. 344.
 
 
 43
 In Szekely and Norris-Thermidor the parties did not discuss the employees by name or job classification, and the eligibility list in those cases was regarded simply as a guide. Here, the record shows clearly that the Company and the Union argued over the Intervenors by name, that Shoreline intended to exclude the particular individuals in question, and had full opportunity to consider their eligibility status. The Company cannot play fast and loose with a pre-election agreement and a stipulated eligibility list.
 
 
 44
 Affirmance of the Board as to Shoreline makes it awkward to reverse the Board as to the Intervenors. We are not anxious to open the back door to a litigant denied the front door, or to open any doors to "subterfuges for hampering and delaying a final determination of a bargaining representative".[8] But there is no necessary relation between Shoreline as a litigant and the Intervenors as litigants. They should not be prejudiced by the fact that a decision in their favor will benefit Shoreline. There is no contention that the Intervenors are fronting for the Company and there is nothing in the record to support any such speculation. Strong considerations impel Board action to give a desirable and necessary finality to consent elections. Stronger considerations impel this Court to recognize that the interests of the Intervenors as four individual rank-and-file employees, caught in the middle of company-union maneuvering, should have been better protected by the Board.
 
 
 45
 Shoreline claims that it made a mistake. So it did. But perhaps the mistake that caused the rub was its not finding out soon enough how the Intervenors intended voting. The Union, perhaps, made no such mistake. At any rate, it was to the interest of the Union to acquiesce in the exclusion of the Intervenors. Thanks to the Company's heedlessness and the Union's acquiescence in the so-called mistake there was no one to speak up for four small disfranchised employees — as long as the Board elected to stand aside in adherence to an inflexible policy of "honoring concessions" by Company and Union.
 
 
 46
 In this case the Board and its agents, up and down the line, seem to take it for granted that the Board must give its blessing to any agreement between a company and a union, whatever the effect on the eligibility of individual employees. This view disregards an important party at interest under the Act and beyond the Act — the rank-and-file employee. We cannot accept the view that a company and a union may agree between themselves to exclude individual employees from an opportunity to select the bargaining agent of a unit in which the particular employees work regularly and have a substantial share in all labor matters affecting that unit. The National Labor Relations Board is not just an umpire to referee a game between an employer and a union. It is also a guardian of individual employees. Their voice, though still and small, commands a hearing. The interest of a rank-and-file worker in selecting an economic representative having the power to fix wages and working conditions is no less important than a citizen's interest in selecting a political representative. It is not necessary to decide that this interest is a right protected by the constitution. The National Labor Relations Act vests the Board with discretionary authority to conduct a fair election — fair for individual employees, as well as for the Company or for the Union. The Board abuses its discretion when it knowingly allows eligible employees to be disfranchised or when it fails to investigate the eligibility of disfranchised employees whose votes would change the results of an election to decide upon a bargaining agent.
 
 
 47
 Eligibility to vote depends on whether an employee is sufficiently concerned with the terms and conditions of employment in a unit to warrant his participation in the selection of a collective bargaining agent. H. P. Wasson & Co., 1953, 105 N.L.R.B. 373. The key fact here is that the bargaining unit was to include production workers. Every employee performing substantial duties in production should have had a chance to vote. The Intervenors were not part-time employees.[9] They were full-time employees working in a dual capacity. Traina spent 75% to 80% of her time in production duties; Mobley 65% to 70%; DePratter 50% to 60%; Diaz 15% to 20%. There is not much doubt, therefore, that the first three clearly were in the unit; their jobs placed them in the position of being vitally interested in the terms and conditions of employment in production duties.[10] Glidden Co., 1947, 74 N.L.R.B. 1257; Ocala Star Banner, 1951, 97 N.L.R.B. 384;[11] Tube Distributors, 1955, 112 N.L.R.B. 296; Sears Roebuck & Co., 1955, 112 N.L. R.B. 559. An employee need not be employed full time in a unit. In the Broderick Co., 1952, 99 N.L.R.B. 385, the Board held that where an employee worked 20% of his time within the unit, the employee was entitled to vote in the unit.
 
 
 48
 The report of the Regional Director shows that the Field Examiner considered the Intervenors eligible, but believed that his hands were tied by Company-Union agreement. The report states:
 
 
 49
 "The fact that the Board probably would have included these employees within the unit, had the case been decided by the Board rather than being resolved by agreement, is not controlling. The Board has a well-established policy of honoring concessions made in the interest of expeditious handling of representation cases in general * * *"
 
 
 50
 The Field Examiner was aware, before the election, of the Intervenors' eligibility. The Regional Director states:
 
 
 51
 "According to Field Examiner West, the discussion which preceded the execution of the Election Agreement brought out the fact that three of the four employees in question did perform production work during part of their work hours, in addition to performing their clerical work or truck driving."
 
 
 52
 The Intervenors filed objections within the five days allowed by Board Rules. The Regional Director concluded that "there is a material and substantial issue" as to whether the Intervenors were prevented from voting, but finessed the issue; they were not eligible:
 
 
 53
 "* * * In the opinion of the undersigned, it would be administratively unwise and wasteful to hold a hearing on the subject of whether the employees were deprived of their right to vote if, in fact, no such right existed."
 
 
 54
 Thus, the Field Examiner knew that the Intervenors were eligible, yet approved their exclusion from voting. The Board agent conducting the election actively discouraged their voting; although he knew that their status was doubtful. The Regional Director realized and admitted that the Board would "probably" have included the Intervenors as eligible voters, and admitted that there was a substantial question as to whether they were deprived of their right to vote, but felt that the Board must "honor concessions" by the Union and the Company. Before this Court the Board tosses the Intervenors a bone so small that they will have trouble getting any sustenance from it: the four workers were not prejudiced, because they are free now to bargain with their employer or to exercise their right of self-organization!
 
 
 55
 "A primary reason [for the Board agent's] presence [is] to make sure that every eligible [voter] of the unit [is] permitted to vote." N. L. R. B. v. Wilkening Mfg. Co., 3 Cir., 1953, 207 F.2d 98, 101. In that case the Court set aside the certification of a union because employees eligible to vote "were deprived of their opportunity to vote under conditions within the control of the Board agent". The Board agent was held responsible for non-action in failing to see that two employees, previously thought ineligible, were not notified of their eligibility to vote. In this case the Board agent knew that the Intervenors, at least Mobley and DePratter, to his positive knowledge, considered themselves eligible to vote. A Board agent is present not only to make sure eligible employees vote but also to make sure that an employee who thinks he is eligible may cast a challenged vote. As to DePratter, who was at the polls as an observer, and as to Mobley, who showed up to vote, we hold that the agent showed an insufficient awareness of the Board's responsibility to conduct a fair and proper election.
 
 
 56
 We hold that the Board cannot free itself of its duty to conduct a fair election simply because a company and a union, for reasons best known to themselves, have come to terms on a pre-election agreement. If there is agreement on a bargaining unit, fair play and a decent respect for the interests of rank-and-file workers require the Board to supervise the election in such a way that all eligible members of the unit have an opportunity to vote for the bargaining representative of their choice. Where agents of the Board knew or had reason to believe that certain employees by definition were members of the unit, it was an abuse of the Board's discretion to take no steps to investigate and determine the eligibility of the employees in question.
 
 
 57
 The Court has great respect for the National Labor Relations Board in its zealous, fairhanded administration of the Act. In this case, however, Board agents nodded when they should have been alert and active. Individual rank-and-file employees, caught in the toils of selfish company-union machinations or in the complexities of honest company-union negotiations, are entitled to look to the Board for protection of their rights.
 
 
 58
 We set aside the decision of the Board, deny enforcement of its order, and remand the cases for any appropriate proceedings not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The Board's decision and order are reported at 117 NLRB 1619. The decision and order were issued under Section 10(c) of the National Labor Relations Act, as amended. 61 Stat. 136, 29 U.S.C.A. § 151 et seq. This Court has jurisdiction under Section 10(e) and (f) of the Act. The alleged unfair labor practices occurred in Tampa, Florida, within this judicial circuit
 
 
 [2]
 Previously the Intervenors and Audrey Miller, whose vote had been challenged, filed suit in the district court for the District of Columbia to enjoin the Board from certifying the Union as a bargaining representative. The Court dismissed the suit on the ground that it had no jurisdiction in an original equity suit in the District Court to review the representation proceedings, in the absence of proof that the Board's action was plainly beyond the scope of its statutory authority. De Pratter v. Farmer, 1956, 98 U.S.App.D.C. 74, 232 F.2d 74
 
 
 [3]
 The agreement entered into between the parties waived hearing prior to the election but left the determination of all issues to the Board as in the ordinary election case. See Sections 101.18 and 102.54 of the Board's Rules and Regulations
 
 
 [4]
 West stated that he and Alley discussed the production work performed by the Intervenors. Alley denied that there was any discussion that indicated the Intervenors performed production work. Shoreline contends that the names of the Intervenors were removed from the eligibility list upon assurances of the Board agent and of the Union representative that the Intervenors performedonly work outside of the unit.
 
 
 [5]
 Shoreline offered proof that the challenged vote was against the Union. The vote was impounded but, apparently on the assumption that it would not have changed the result of the election, the Board made no investigation. Miller, the challenged voter, intervened in the representation proceedings and was one of the plaintiffs in De Pratter v. Farmer, 1956, 98 U.S.App.D.C. 74, 232 F.2d 74
 
 
 [6]
 The Trial Examiner gave no weight to this petition, citing Brooks v. N. L. R. B., 1952, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 for the proposition that a certification must be honored for a reasonable period, usually a year. The Intervenors argue that the petition and other facts bring this case within the exception Brooks recognizes where there are unusual circumstances. We prefer to rest our decision on a broader basis
 
 
 [7]
 "The aim of § 9(h) is clear. It imposes a criminal penalty for filing a false affidavit so as to deter the Communist officers from filing at all. The failure to file stands as a barrier to the making of an investigation by the Board and the issuance of any complaint for the benefit of the union in question. * * * The filing of the required affidavits by the necessary officers is the key that makes available to the union the benefit of the Act
 "The Board is under a duty to determine whether a filing has been made by each person specified in § 9(h), since its power to act on Union charges is conditioned on filing of the necessary affidavits. That was the extent of our rulings in N. L. R. B. v. Highland Park Mfg. Co., 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969; N. L. R. B. v. Coca-Cola Bottling Co., 350 U.S. 264, 76 S.Ct. 383, 100 L.Ed. 285." Leedom v. International Union of Mine, Mill & Smelter Workers, 1956, 352 U.S. 145, 148, 77 S.Ct. 154, 156, 1 L.Ed.2d 201.
 
 
 [8]
 N. L. R. B. v. Capitol Greyhound Lines, 6 Cir., 1944, 140 F.2d 754, 758, certiorari denied 322 U.S. 763, 64 S.Ct. 1285, 88 L. Ed. 1590
 
 
 [9]
 There was no stipulation to exclude employees working part-time in the unit, as in Bachman Buxbridge Worsted Corp., 1954, 109 N.L.R.B. 868. The Regional Director makes the assumption that the Intervenors might have been excluded because of an oral agreement to exclude part-time production workers, but the evidence does not support this assumption. The Regional Director rested his decision on the parties' agreement to exclude the Intervenors by name
 
 
 [10]
 Traina spends 75 to 80% of her time in production-type duties, such as: weighing, washing and testing the percentage of glaze of shrimp, running wrapping machines, working on the overwrap machines, weighing packages, packing retail packages of shrimp, stitching cartons on the box-making machine, stencilling cartons, scooping and placing shrimp from the tunnel into boxes, moving cartons of shrimp on the conveyor into cold storage room, hand overwrapping shrimp. The remaining 20 to 25% of her time is spent in duties of a clerical nature, i. e. recording employees' time on and off duty
 Mobley spends 65 to 70% of her time in production duties, such as: stitching boxes, running overwrap machines, hand overwrapping shrimp, peeling and deveining shrimp, working on inspection belt, placing shrimp in aluminum trays before freezing, receiving shipments of incoming shrimp, filling and weighing packages of green headless shrimp, scooping shrimp into packages and weighing packages, placing packages in cartons, moving cartons on conveyors. The remaining 30 to 35% of her time is spent in recording employees' time and recording finished product production figures.
 Ruth DePratter spends 50 to 60% of her time in production duties consisting of packing green headless shrimp, counting shrimp, working on the inspection belt before shrimp are graded, hand overwrapping shrimp, weighing green headless shrimp, placing boxes of green headless shrimp on tunnel trucks after they have been weighed, assisted in checking shipments of shrimp after unloading from trucks, assisted in checking outgoing shipments of shrimp, "tidying up" Plant Superintendent's office, answering plant telephone. She spends the remainder of her time, from 40 to 50%, in recording employees' time, and checking grading sheets and tags.
 Joe Diaz spends 80 to 85% of his time as a truck driver. The remaining 15 to 20% of his time is spent in production and maintenance duties.
 
 
 [11]
 In Ocala Star Banner, 1951, 97 N.L. R.B. 384 the Board held:
 "In dealing with the voting rights of employees who work part of the time in the appropriate unit and part of the time do other work for the employer, the Board in many cases has applied a rule extending the franchise only to those who spend 50% or more of their time in the unit. On the other hand, in deciding the eligibility of part-time employees who, when they are not working in the unit, may be working for another employer or may be merely remaining idle, the Board generally has allowed such employees to vote even though they spend less than 50 percent of their time at work included in the unit, provided only that they are regularly employed for sufficient periods of time to demonstrate that they have a sufficient interest in the wages, hours, and working conditions of the employees in the appropriate unit. Upon reconsideration of these different eligibility rules, the Board is persuaded that the latter rule should be applied not only to regular part-time employees but also to employees performing more than one function for the same employer."