NATIONAL LICORICE CO. *v.* NATIONAL LABOR
RELATIONS BOARD.

No. 272. Argued February 7, 1940.—Decided March 4, 1940.

Mr. *Abraham Mann* for petitioner.

Mr. *Robert B. Watts,* with whom *Solicitor General Jackson* and *Messrs. Charles Fahy* and *Laurence A. Knapp* were on the brief, for respondent.

MR. JUSTICE STONE delivered the opinion of the Court.

Apart from the sufficiency of the evidence to support an order of the National Labor Relations Board, the questions of importance presented for our decision are whether the Board has authority to order an employer not to enforce contracts with its employees, found to have been procured in violation of the National Labor Relations Act, and to contain provisions violating that Act, in the absence of the employees as parties to the proceeding; and whether the Board has authority to make its order relating to the contracts, although the unfair labor practices found to affect the contracts were not set up in the charge presented to the Board, on the basis of which it issued its complaint.

On August 2, 1937, the Bakery & Confectionery Workers International Union of America, Local Union No. 405, a labor organization, affiliated with the American Federa-

352

tion of Labor, lodged with the National Labor Relations Board an amended charge, alleging that petitioner had engaged in certain unfair labor practices in violation of the National Labor Relations Act. After a complaint by the Board charging petitioner with unfair labor practices had been served October 7, 1937, and after hearings, the Board found jurisdictional facts, which need not be repeated, and other facts which may be shortly summarized as follows: Petitioner is engaged in business in the manufacture of licorice products which it sells and ships in commerce, employing at its Brooklyn, New York, plant about one hundred and forty production employees. The Board found that early in July, 1937, the Union began to secure signatures of petitioner's employees to applications for membership; that on July 14, 1937, ninety-nine of petitioner's one hundred and forty employees had signed applications for membership, designating the Union as the applicant's representative for collective bargaining; that the number had increased to one hundred and nine on July 19th or 20th. On that date a meeting was held between representatives of the Union and officers of petitioner, at which the Union demands were presented. The negotiations came to nothing and were promptly followed by an unsuccessful effort on the part of petitioner's representatives to circulate among the employees a petition, nominating a committee to act as their collective bargaining representative.

On July 29th a second meeting took place between representatives of the Union and the president and other officers of the company, at which the petitioner declined to recognize the Union as the bargaining representative of all the employees, and declared that it would negotiate with the Union only as the bargaining representative of its members. The meeting adjourned without reaching any agreement. On August 2nd the employees went out on strike. The plant was closed and not reopened

until the conclusion of the strike on August 25th. August 5th had been agreed upon for a third meeting, and on the evening of August 2nd, after the strike had begun, the Union representatives wrote to petitioner stating that the Union was ready to meet with petitioner at any time or place which it would designate "in order to mediate the dispute and through collective bargaining arrive at a mutually satisfactory agreement." Petitioner replied, declaring that it believed the Union had called the strike. It cancelled the meeting of August 5th and asserted that it would not "set any further time for negotiations until we have a letter from you informing us as to whether or not this strike was instigated, ordered or approved by your Union or officials of the Union." Representatives of the Union denied that it had called the strike. The Board found that the strike was the result of spontaneous action by the employees because of dissatisfaction with the course of negotiations between the Union and petitioner.

On August 27th after the plant was reopened, petitioner sent a letter to each employee requesting him to return to work on August 30th. On the same day petitioner's representative met with three employees who stated that they were anxious to return to work, and asked whether they could have their own committee and bargain with petitioner. They were informed that if they could obtain the authorization of a majority of the employees, petitioner would deal with them. Thereafter, petitioner's president, at the request of one of the three, prepared a form of letter designating a committee of workers as the Collective Bargaining Representatives of the employees and revoking the authority to any other organization. The letter was signed by the members of the committee and one hundred and ten other employees, and returned to petitioner on September 9th.

At a meeting with the Committee on September 10th, petitioner's president renewed proposals for a contract,

354

which he had made at the meetings with the Union representatives on July 20th and July 29th, stipulating for a five per cent. wage increase, time and a half for overtime, and one week's vacation with pay. The Committee's only request related to pay for holidays and a reduction of the term of the contract from five to three years, which was granted with some modification. As finally agreed upon the contract purports to be made between the petitioner, the Committee and "each and every one of the employees." [1] Petitioner furnished the Committee members with mimeographed copies of the agreement, telling them to explain it to the best of their ability to the employees, and giving explicit instructions as to the manner in which the individual contracts were to be executed. There was testimony by a number of witnesses that petitioner's president informed the employees that he would not "protect their jobs and they would not get five per cent. if they did not sign the agreement." One group of fourteen employees asked for

---

[1] An officer of petitioner admitted that he had consulted with the Brooklyn Chamber of Commerce in forming the contracts. The contracts involved here follow the "Balleisen formula," said to be devised by L. L. Balleisen, Industrial Secretary of the Chamber. The contract "executed between the company and each workman individually and not as a collective agreement with representatives of the employees, as provided by the Act," *National Labor Relations Board* v. *Hopwood Retinning Co.*, 98 F. 2d 97, 100, has been held to violate the Act in *National Labor Relations Board* v. *Hopwood Retinning Co., supra; National Labor Relations Board* v. *American Mfg. Co.*, 106 F. 2d 61, 66; Matter of Atlas Bag & Burlap Co., 1 N. L. R. B. 292; Matter of Cating Rope Works, Inc., 4 N. L. R. B. 1100; Matter of Metropolitan Engineering Co., 4 N. L. R. B. 542; Matter of David E. Kennedy, Inc., 6 N. L. R. B. 699; Matter of Art Crayon, Inc., 7 N. L. R. B. 102; Matter of Eastern Footwear Corp., 8 N. L. R. B. 1245; Matter of American Numbering Machine Co., 10 N. L. R. B. 536; Matter of Centre Brass Works, Inc., 10 N. L. R. B. 1060; Matter of Fanny Farmer Candy Shops, Inc., 10 N. L. R. B. 288; Matter of National Meter Co., 11 N. L. R. B. 320.

representation on the Committee and were referred to petitioner's president, who, in refusing the request, informed them that "the Committee had been picked already. There is enough right now on the Committee." The contract is stated to be directly between the petitioner and the individual employee and under it the Committee as such has no rights or duties. It was signed by the Committee and one hundred and eighteen employees. The Committee appears to have functioned only so long as it was necessary to obtain the individual signatures on the contract. The benefits of the contract were limited to those employees who signed. In return the signers relinquished the right to strike, the right to demand a closed shop or signed agreement with any union. The contract also contained provisions for arbitration as to rate of wages and the number of regular hours of employment per week by an arbitrator designated by and mutually acceptable to petitioner and the Committee, but provided that the "question as to the propriety of an employee's discharge is in no event to be one for arbitration or mediation. . . ."

From these subsidiary findings of fact the Board concluded that petitioner, by refusing to bargain collectively with the Union on July 20th and July 29th and thereafter, had engaged in unfair labor practices within the meaning of § 8 (5) of the Act; that petitioner, by coercing and intimidating employees in the exercise of their rights to self-organization and collective bargaining, and by persuading and coercing its employees to refrain from becoming members of the Union and to sign individual contracts of employment, had engaged in an unfair labor practice within the meaning of § 8 (1) of the Act, and that by initiating, sponsoring and dominating a labor organization of its employees, the Collective Bargaining Committee, it had engaged in unfair labor practices within the meaning of § 8 (1) and (2) of the Act. The

Board's order directed petitioner to desist from dominating and interfering with the administration of the Collective Bargaining Committee, from recognizing the Committee as representing petitioner's employees, from giving effect to petitioner's contracts with the Committee and with the individual employees, and from refusing to bargain collectively with the Union. As affirmative relief, designed to effectuate the policy of the Act as authorized by § 10 (c), the Board ordered petitioner to bargain collectively, on request, with the Union; to withdraw recognition from the Committee; to inform the Committee and employees who had contracted individually that "such contract constitutes a violation" of the Act; that the employees are relieved from all obligations under it; that petitioner will "no longer demand its performance" and to post appropriate notices.

The Court of Appeals for the Second Circuit, upon petition of the Board for enforcement of the order, directed that it be enforced except for a modification of that part of the order which directed that petitioner recognize and bargain with the Union. The order of the Court of Appeals directed that this part of the Board's order be conditioned upon a determination in an election that the Union is still the choice as bargaining representative of a majority of the employees. 104 F. 2d 655.

Upon a petition which challenged the authority of the Board to make so much of its order as related to the contracts with petitioner's employees, without making the employees parties to the proceeding, we granted certiorari October 9, 1939, because of the importance of the question in the administration of the National Labor Relations Act, and because of an asserted misapplication of the principles of *National Labor Relations Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261 and *Consolidated Edison Co.* v. *National Labor Relations Board,* 305

U. S. 197. Of lesser moment are questions, also raised by the petition,[2] whether the Board's finding that the Union was still the authorized bargaining representative of a majority of petitioner's employees, is supported by substantial evidence and; if not, whether the Circuit Court of Appeals properly directed the Board to conduct an election to determine whether the Union still represents a majority of petitioner's employees, and, finally, whether the jurisdiction of the Board is limited to such unfair labor practices as are set up in the charge presented to the Board so as to preclude its determination that the creation of the Organization Committee and petitioner's contracts with individual employees involved unfair labor practices, since both occurred after the charge was lodged with the Board and after its complaint was served on petitioner.

1. The Board found that petitioner, on July 20th and 29th, 1937, and thereafter, refused to recognize and to bargain collectively with the representative (the Union) of a majority of its employees. If we assume, as petitioner argues, that a majority of its employees had freely revoked their designation of the Union as bargaining representative and chosen in its stead the Collective Bargaining Committee, these circumstances do not militate against the findings of the Board that the Union represented the employees during July and August when the petitioner refused to bargain with it, nor do they relieve petitioner from the consequences of its refusal to bargain, which was an unfair labor practice.

Since the Court of Appeals has confirmed the findings of the Board, there is no occasion here to review the evidence in detail. *Cincinnati, H. & D. Ry. Co. v. Interstate.*

---

[2] Petitioner's brief assails the Board's order on numerous grounds not set up in his petition for certiorari. We limit our review to the questions specifically raised in the petition. Rule 38. See *General Pictures Co.* v. *Western Electric Co.*, 304 U. S. 175, 177, 178.

*Commerce Commission,* 206 U. S. 142, 154; *Illinois Central R. Co.* v. *Interstate Commerce Commission,* 206 U. S. 441, 456. It is enough, with the findings not challenged, that there is evidence that by July 20th one hundred and nine of petitioner's one hundred and forty employees had signed applications for membership in the Union, designating it as the applicant's representative for collective bargaining, and that on that date negotiation began between petitioner and the Union representatives which was continued until August. The evidence shows that attempts by petitioner between that date and July 20th to circulate a petition among its employees nominating a committee to act as their collective bargaining representative failed. A few employees signed. Then, a number cancelled their signatures. The petition was returned to the petitioner's superintendent and was destroyed by an assistant secretary of the company. There is testimony that at the meeting with the Union representatives on July 29th petitioner's president declined to recognize the Union as the bargaining representative of all the employees, and declared that he would negotiate with it only as the bargaining representative of the Union members, refusing to bargain with it as the representative of all the employees, a plain violation of the Act. §§ 8 (5), 9 (a). This was followed by petitioner's refusal, on August 2nd, to negotiate with Union representatives. There was also evidence from which the Board could have found that the negotiations on July 20th and July 29th were not entered into by the petitioner in good faith, and were but thinly disguised refusals to treat with the Union representatives.

In view of the evidence already noted of the choice of the Union as bargaining representative by a large majority of the employees between July 14th and 20th, of the complete failure of petitioner's efforts to disturb that representation between the 20th and the 29th, there was

substantial evidence to support the Board's conclusion that the Union was the choice as bargaining representative of appellant's employees during July and in August, at least until the 5th, when petitioner refused to treat with the Union.

As will presently appear, the bargaining committee and the contracts obtained through its mediation were both the products of unfair labor practices, and the Committee, under the Board's order, was not entitled to recognition as the bargaining representative of the employees. Such injury, if any, as the petitioner might have suffered from the Board's order requiring it to recognize and bargain with the Union, is avoided by the direction of the Court of Appeals that this part of the order be conditioned upon a determination by an election that the Union is still the choice of a majority of the employees. The Board has not petitioned for certiorari and does not complain of this direction.

2. The petition for certiorari does not assail the findings of the Board that petitioner's officials initiated the organization of the Committee, and that it "sponsored and dominated the formation of the Committee and thereafter dominated its administration and contributed support to it." We shall not re-examine those issues here; more than to say that the evidence discloses that the purpose of creating the Committee was to secure the contracts and by the contracts the Committee was left without any further function to perform except to join with the employer in choosing an arbitrator for the arbitration of specified labor disputes.

But the petition raises the question whether the terms of the contract, as the Court of Appeals held, violate the National Labor Relations Act, and it challenges the authority of the Board because of the absence of the individual employees, as parties, to make any order respecting the contracts. The contracts, as the Board found, were

not only procured through the mediation of a company-dominated labor organization, but they were the means adopted to "eliminate the Union as the collective bargaining agency of its employees." We think it plain also that by their terms they imposed illegal restraints upon the employees' rights to organize and bargain collectively guaranteed by §§ 7 and 8 of the Act.

By the contract each employee agreed not "to demand a closed shop or a signed agreement by his employer with any Union." This provision foreclosed the employee from bargaining for a closed shop or a signed agreement with the employer, frequent subjects of negotiation between employers and employees, see *Consolidated Edison Co.* v. *National Labor Relations Board, supra,* 236 *et. seq.; National Labor Relations Board* v. *Sands Mfg. Co.,* 306 U. S. 332, 342; cf. *Virginian Railway Co.* v. *System Federation No. 40,* 300 U. S. 515, 553, 555, note 7. In addition the restriction upon the employee's right to ask a signed agreement extending only to agreements with "any union" is in plain conflict with the public policy of the Act to encourage the procedure of collective bargaining; see § 1, since it discriminates against labor organizations by forbidding signed contracts with labor unions while it permits them with the individual workers. See *Consolidated Edison Co.* v. *National Labor Relations Board, supra,* 236.

It likewise forestalls collective bargaining with respect to discharged employees, first providing that a discharged employee may submit to the employer facts indicating that his discharge was unreasonable and then stipulating that the "question as to the propriety of an employee's discharge is in no event to be one for arbitration or mediation." The effect of this clause was to discourage, if not forbid, any presentation of the discharged employee's grievances to appellant through a labor organization or his chosen representatives, or in any way except personally.

Since the contracts were the fruits of unfair labor practices, stipulated for the renunciation by the employees of rights guaranteed by the Act, and were a continuing means of thwarting the policy of the Act, they were appropriate subjects for the affirmative remedial action of the Board authorized by § 10 of the Act. *National Labor Relations Board* v. *Pennsylvania Greyhound Lines, Inc.,* *supra,* 265; *National Labor Relations Board* v. *Newport News Shipbuilding & Dry Dock Co.,* 308 U. S. 241. Hence the Board was free by its order to direct that the appellant should take no benefit from the contracts unless it was without authority to act because the individual signers of the contracts had not been made parties to the proceeding. It is urged that in the absence of the employees who signed the contract, the Board was powerless to declare it void and of no effect as to those employees, and that consequently it could make no order forbidding petitioner to make use of the contracts as the means of defeating the policy and purposes of the Act.

*Consolidated Edison Co.* v. *National Labor Relations Board, supra,* is not decisive of this question. There, page 236, after pointing out that the Board's "power to command affirmative action is remedial, not punitive, and is to be exercised in the aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act," decision was rested specifically on the ground that "here, there is no basis for a finding that the contracts with the Brotherhood and its locals were a consequence of the unfair labor practices found by the Board or that these contracts in themselves thwart any policy of the Act or that their cancellation would in any way make the order to cease the specified practices any more effective."

It is elementary that it is not within the power of any tribunal to make a binding adjudication of the rights *in personam* of parties not brought before it by due process of law. *Pennoyer* v. *Neff,* 95 U. S. 714; *Riverside & Dan River Cotton Mills* v. *Menefee,* 237 U. S. 189; cf. *Arizona* v. *California,* 298 U. S. 558, 571, 572. For that reason there is no occasion to consider now how far the contract rights, if any, of the employees may be passed upon by the Board and their exercise restricted by its order in proceedings to which the employees have been made parties. As the Board's power can be effectively exercised only upon petitioner, the employees are entitled to notice and hearing only if the statute requires them to be made parties to the proceeding. Consequently the only question we are called on to decide is whether, in the circumstances of this case, the exercise of the Board's authority is such a departure from accepted modes of procedure as rightly to be regarded as beyond the power conferred on the Board by § 10 of the Act.

The proceeding authorized to be taken by the Board under the National Labor Relations Act is not for the adjudication of private rights. *Amalgamated Utility Workers* v. *Consolidated Edison Co., ante,* p. 261; H. Rept. No. 1147, 74th Cong., 1st Sess., Committee on Labor, p. 24; cf. *Federal Trade Commission* v. *Klesner,* 280 U. S. 19. It has few of the indicia of a private litigation and makes no requirement for the presence in it of any private party other than the employer charged with an unfair labor practice. The Board acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining and by protecting the "exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment. . . ." § 1.

The immediate object of the proceeding is to prevent unfair labor practices which, as defined by §§ 7, 8, are practices tending to thwart the declared policy of the Act. To that end the Board is authorized to order the employer to desist from such practices, and by § 10 (c) it is given authority to take such affirmative remedial action as will effectuate the policies of the Act. *National Labor Relations Board* v. *Pennsylvania Greyhound Lines, supra.*

In a proceeding so narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights. Ordinarily where the rights involved in litigation arise upon a contract, courts refuse to adjudicate the rights of some of the parties to the contract if the others are not before it. *Shields* v. *Barrow,* 17 How. 130, 140; *Carroll* v. *New York Life Ins. Co.,* 94 F. 2d 333; cf. *Waterman* v. *Canal-Louisiana Bank Co.,* 215 U. S. 33, 48. Such a judgment or decree would be futile if rendered, since the contract rights asserted by those present in the litigation could neither be defined, aided nor enforced by a decree which did not bind those not present.

But different considerations may apply even in private litigation where the rights asserted arise independently of any contract which an adverse party may have made with another, not a party to the suit, even though their assertion may affect the ability of the former to fulfill his contract. The rights asserted in the suit and those arising upon the contract are distinct and separate, so that the court may, in a proper case, proceed to judgment without joining other parties to the contract, shaping its decree in such manner as to preserve the rights of those not before it. *General Investment Co.* v. *Lake Shore Ry.,* 260 U. S. 261, 285, 286; *American Brake Shoe & Foundry Co.* v. *Interborough Rapid Transit Co.,* 10 F. Supp. 512,

515, aff'd ·76 F. 2d 1002; *Fidelity & Deposit Co.* v. *Montana,* 92 F. 2d 693, 698; *Brogdex Co.* v. *Food Machinery Co.,* 92 F. 2d 787, 789; *Commercial Casualty Ins. Co.* v. *Lawhead,* 62 F. 2d 928, 931, 932; cf. *Hamilton* v. *Savannah, F. & W. Ry. Co.,* 49 F. 412; *Howe* v. *Howe & Owen Ball Bearing Co.,* 154 F. 820, 828; *Alcazar Amusement Co.* v. *Mudd & Colley Amusement Co.,* 204 Ala. 509; 86 So. 209; *E. L. Husting Co.* v. *Coca-Cola Co.,* 194 Wis. 311; 216 N. W. 833; *Nokol Co.* v. *Becker,* 318 Mo. 292; 300 S. W. 1108.

Here the right asserted by the Board is not one arising upon or derived from the contracts between petitioner and its employees. The Board asserts a public right vested in it as a public body, charged in the public interest with the duty of preventing unfair labor practices. The public right and the duty extend not only to the prevention of unfair labor practices by the employer in the future, but to the prevention of his enjoyment of any advantage which he has gained by violation of the Act, whether it be a company union or an unlawful contract with employees, as the means of defeating the statutory policy and purpose. Obviously employers cannot set at naught the National Labor Relations Act by inducing their workmen to agree not to demand performance of the duties which it imposes or by insisting, more than in a private litigation, that the employer's obedience to the Act cannot be compelled in the absence of the workers who have thus renounced their rights.

The Board's order runs only against petitioner. It directs that it shall cease recognizing the Committee as the representative of any of the employees for the purpose of dealing with petitioner concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work; that it shall not "give effect" to the contracts with its employees; that it notify each

employee that the contract violates the Act and that petitioner "is therefore obliged to discontinue such contract as a term or condition of employment; and the employees are released from its obligations and the respondent [petitioner here] will no longer demand its performance," and that it "will no longer offer, solicit, enter into, continue, enforce or attempt to enforce such contracts with its employees."

The effect of the Board's order, as we construe it, is to preclude the petitioner from taking any benefit of the contracts which were procured through violation of the Act and which are themselves continuing means of violating it, and from carrying out any of the contract provisions, the effect of which would be to infringe the rights guaranteed by the National Labor Relations Act. It does not foreclose the employees from taking any action to secure an adjudication upon the contracts, nor prejudge their rights in the event of such adjudication. We do not now consider their nature and extent. It is sufficient to say here that it will not be open to any tribunal to compel the employer to perform the acts, which, even though he has bound himself by contract to do them, would violate the Board's order or be inconsistent with any part of it. Section 10 (a) and (c) of the Act commits to the Board the exclusive power to decide whether unfair labor practices have been committed and to determine the action the employer must take to remove or avoid the consequences of his unfair labor practice.

In these respects the order does not go beyond those in suits brought by the United States to restrain violations of the Sherman Act, where the injunction was broad enough to prevent the offender from carrying out contracts with persons not parties to the suits. *United Shoe Machinery Corp.* v. *United States,* 258 U. S. 451, 456; *Paramount Famous Corp.* v. *United States,* 282 U. S. 30;

*Interstate Circuit, Inc.* v. *United States,* 306 U. S. 208, 220. Similarly, in proceedings before the Federal Trade Commission, the order restraining unfair methods of competition may preclude the performance of outstanding contracts by the offender. Such orders have never been challenged because the holders of the contracts were not made parties. E. g. *Butterick Co.* v. *Federal Trade Commission,* 4 F. 2d 910; *Q. R. S. Music Co.* v. *Federal Trade Commission,* 12 F. 2d 730; *J. W. Kobi Co.* v. *Federal Trade Commission,* 23 F. 2d 41. Cf. *Federal Trade Commission* v. *Beech-Nut Co.,* 257 U. S. 441. In *Virginian Railway Co.* v. *System Federation No. 40, supra,* 539, 540; 11 F. Supp. 621, 623, the effect of the decree was to order the employer to deal exclusively with the Federation, although the employer had a contract with an association not a party to the suit, found to be a dominated labor organization. In every case the third persons were left free to assert such legal rights as they might have acquired under their contracts. But in all, the public right was vindicated by restraining the unlawful actions of the defendant even though the restraint prevented his performance of the contracts.

As the National Labor Relations Act contemplates no more than the protection of the public rights which it creates and defines, and as the Board's order is directed solely to the employer and is ineffective to determine any private rights of the employees and leaves them free to assert such legal rights as they may have acquired under their contracts, in any appropriate tribunal, we think they are not indispensable parties for purposes of the Board's order and the statute does not require their presence as parties to the present proceeding and there was no abuse of the Board's discretion in its failure to make them parties.[3] It is unnecessary to consider now to what ex-

---

[3] Orders of the Board have been upheld which direct the employer to cease giving effect to such contracts, although no notice was given

tent or by what procedure it would be necessary to make the employees parties to a proceeding pending before the Board in the event that it undertook to make an order directed to the employees foreclosing any asserted rights under their contracts in order to effectuate the policies of the Act. Compare the procedure used in *New England Divisions Case,* 261 U. S. 184, 197.

The Board's order to post notices requires the notice to announce that the contracts with the employees are "void and of no effect." In order that the notice may more accurately represent the affirmative action of the Board and that misinterpretation of its action may be avoided, the order appealed from should be so modified as to omit the quoted words and direct that clause (3) of the Board's order, numbered 2 (d) specifying the contents of the notice, read as follows:

(3) that the individual contracts of employment entered into between the respondent and some of its employees were made by the respondent in violation of the National Labor Relations Act; and that the respondent will no longer offer, solicit, enter into, continue, enforce, or attempt to enforce such contracts with its employees; but this is without prejudice to the assertion by the employees of any legal rights they may have acquired under such contracts.

3. The amended charge, which initiated the present proceeding pursuant to § 10 (b) of the Act, was lodged

---

to the company-dominated labor organizations or the employees. *National Labor Relations Board* v. *Hopwood Retinning Co.,* 98 F. 2d 97, 99, 100; *National Labor Relations Board* v. *Eagle Mfg. Co.,* 99 F. 2d 930; *National Labor Relations Board* v. *Ronni Parfum, Inc.,* 104 F. 2d 1017; *National Labor Relations Board* v. *Stackpole Carbon Co.,* 105 F. 2d 167, 169; *Titan Metal Mfg. Co.* v. *National Labor Relations Board,* 106 F. 2d 254. *Contra: National Labor Relations Board* v. *Cowell Portland Cement Co.,* 108 F. 2d 198; *National Labor Relations Board* v. *Sterling Electric Motors, Inc.,* 109 F. 2d 194; 5 Labor Relations Reporter 600.

with the Board by the Union on August 2, 1937, before petitioner had succeeded in organizing the Committee and in securing the signatures of its employees to the contracts, but after petitioner's unsuccessful attempt in July to deal with its employees independently of the Union. The charge, in addition to other unfair labor practices not now material, alleged that petitioner had "coerced and attempted to coerce its employees into signing individual contracts with the said company; in that the said company has called meetings of its employees and has compelled said employees to attend said meetings, and has attempted to compel said employees to form committees, not of their own choosing, to bargain collectively with the said company; . . ."

The complaint elaborated the charge with particularity, setting forth that petitioner had formed and initiated a labor organization of its employees, dominated and interfered with the administration of that organization, and had continued to do so down to the date of the complaint, October 2, 1937; that petitioner "has made signing of individual contracts a condition of employment"; and that by these and other acts petitioner "is interfering with, restraining, and coercing its employees in exercise of the rights guaranteed by § 7 of the Act."

Petitioner contends that the charge is a jurisdictional prerequisite to the complaint and subsequent proceedings, and that they are restricted to the specific unfair labor practices alleged in the charge. See *National Labor Relations Board* v. *Hopwood Retinning Co.*, 98 F. 2d 97. It argues that in the proceedings before the Board there was a fatal departure from the charge insofar as the Board's finding and order are concerned with the subsequent organization of the Committee and the signing of the employees' contracts. The argument is addressed only to want of power in the Board and raises no question of unfairness to petitioner in the preparation and prosecution of his case.

. It is unnecessary for us to consider now how far the statutory requirement of a charge as a condition precedent to a complaint excludes from the subsequent proceedings matters existing when the charge was filed, but not included in it. Whatever restrictions the requirements of a charge may be thought to place upon subsequent proceedings by the Board, we can find no warrant in the language or purposes of the Act for saying that it precludes the Board from dealing adequately with unfair labor practices which are related to those alleged in the charge and which grow out of them while the proceeding is pending before the Board. The violations alleged in the complaint and found by the Board were but a prolongation of the attempt to form the company union and to secure the contracts alleged in the charge. All are of the same class of violations as those set up in the charge and were continuations of them in pursuance of the same objects. The Board's jurisdiction having been invoked to deal with the first steps, it had authority to deal with those which followed as a consequence of those already taken. We think the court below correctly held that "the Board was within its power in treating the whole sequence as one."

We find it unnecessary to discuss other points raised by the petitioner. We have considered them and find them without merit.

The order below will be modified as directed by this opinion and as so modified it will be affirmed.

*Affirmed.*

Mr. Justice Murphy took no part in the consideration or decision of this case.

Mr. Justice Douglas:

Mr. Justice Black and I see no reason or occasion for the modification of the order. For as stated in the

opinion of the Court, the Board has not undertaken to pass on the rights of the employees under those contracts. Nor has any employee urged, here or below, that the order affects his contractual rights or casts a cloud on them. Whether the employees would be indispensable parties to the proceeding should the Board in order to effectuate the policies of the Act undertake to nullify their rights is a question on which we want to reserve decision until the Board passes on it and until it is put in issue by persons who have a standing to raise it.