**UNITED STATES of America,**
**Plaintiff,**

v.

**CARTER PRODUCTS, INC. and American Home Products Corporation,**
**Defendants.**

United States District Court
S. D. New York.
Oct. 30, 1962.

See also 28 F.R.D. 373.

Harry G. Sklarsky, John J. Galgay, Dept. of Justice, for plaintiff, United States, Bernard Wehrmann, J. Paul Mc-Queen, Gerald R. Dicker, New York City, Bertram M. Kantor, of counsel.

Breed, Abbott & Morgan, New York City, for defendant, Carter Products, Inc., Edward J. Ross, Stephen R. Lang, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant, American Home Products Corp., George B. Turner, Oliver C. Biddle, Harry H. Voigt, New York City, of counsel.

WEINFELD, District Judge.

In this antitrust suit the Government and the defendant Carter Products, Inc. have stipulated to a proposed final judgment and seek the Court's approval. The Government urges approval as in the public interest since it would forthwith end an alleged existing monopolistic control of a widely distributed drug and open up the avenues of competition. The defendant American Home Products Corporation opposes entry of the proposed decree on the ground that it would abrogate American's rights under an existing contract with Carter Products, the codefendant, without any judicial determination of its validity and asks that consideration of any decree be deferred until after a trial on the merits. The parties have submitted briefs and affidavits and the Court has heard counsel on oral argument in support of their respective positions.

The action was commenced against both defendants, charging a conspiracy to restrain and to monopolize, and further an unlawful attempt to monopolize, interstate and foreign trade and commerce of the United States in meprobamate tranquilizing drugs and combination meprobamate drugs, in violation of sections 1 and 2 of the Sherman Act.[1]

Meprobamate compound is a chemical product covered by a patent issued in 1955 and owned by Carter. It is an ethical drug, that is, it may be sold only on a physician's prescription. The compound is the sole active ingredient in meprobamate tranquilizing drugs. They are prescribed in mild cases of neurosis, anxiety and tension. Meprobamate is also combined with one or more active ingredients having additional therapeutic qualities. These are known as combination drugs and prescribed for treatment of arthritis, gastrointestinal, cardiac and other ailments.

The essence of the charges is that the defendants, by concert of action, have excluded all others from the manufacture, sale and distribution in the United States of meprobamate tranquilizing drugs; that they fix and maintain prices, terms and conditions for their sale; and further that they determine who will manufacture, use and sell combination drugs. The Government alleges that the result of the defendants' conduct has been the foreclosure of actual and potential domestic and foreign competition from others; that competition has been eliminated between the defendants themselves; and that in consequence the public has had to pay artificially high and noncompetitive prices for drugs containing meprobamate.

The charges center about an agreement between Carter and American made

---

1. 15 U.S.C. §§ 1, 2 (1958).

shortly after the patent was issued. Under its terms Carter granted American, for the life of the patent, the exclusive (except as to Carter) right to use and sell the drug. American was not granted the right to manufacture the drug; Carter continued as the sole manufacturer. American's total requirements for meprobamate are bought from Carter "at prices as may be mutually agreed upon." Carter retained the right to sell the compound to other pharmaceutical houses for use in combination with other drugs, but under the restriction that it first notify and discuss the same with American.

The two defendants are the only companies which sell the meprobamate tranquilizer drugs. Carter sells the drug in tablet form under the trade name Miltown and American under the trade name Equanil. In addition they, as well as other pharmaceutical companies, sell combination drugs in the United States under various trademarks, but no pharmaceutical house sells those combination drugs in the United States which are sold here by Carter or American.

The drugs have gained wide acceptance by physicians and their patients as is evident from the total dollar sales volume. The domestic and foreign commerce of the meprobamate tranquilizing drugs and combination drugs for the year 1961 was in excess of $75,000,000. The total domestic sales of meprobamate tranquilizing drugs was $48,493,000, of which American sold $34,295,000 and Carter $14,198,000. The total domestic sales volume of combination drugs was $16,928,100, of which Carter sold $7,622,100 and American $4,784,000, the balance being sold by other pharmaceutical concerns. Foreign sales of both drugs by the defendants alone in that year amounted to almost $10,000,000.

The provisions of the agreement which the Government contends have achieved monopolistic control of the meprobamate compound market, in substance, are Carter's undertaking—

(1) not to grant to other qualified pharmaceutical houses the same rights granted to American with respect to sale and distribution of the single drug;

(2) not to permit others than American to make and sell combination drugs without notifying American and discussing the same with American; and

(3) to exclude others than American from selling in the United States combination drugs as defined in the agreement;

and American's undertaking (among others)—

(1) not to sell meprobamate compound "in bulk" to others;

(2) not to use or sell any combination product without first notifying Carter and discussing the same with Carter;

(3) to use and sell certain combination drugs only; and

(4) not to publish the results of its own research in the meprobamate field without Carter's consent.

The papers presented on this application and the oral argument of counsel indicate that attorneys for the Department of Justice and those representing both defendants sought to reach an accord on a proposed consent decree; however, during the course of intensive negotiations which extended over an eight-month period, the defendants who originally acted jointly came to the parting of the ways as to provisions to be incorporated therein. Finally, the Government and Carter agreed upon the stipulation now presented to the Court for its consideration.

The terms of the proposed decree which draw the opposition of American relate essentially to its contract with Carter. Under one provision, Carter is required to offer to sell and to sell meprobamate compound on an unrestricted and nondiscriminatory basis as to price, terms and conditions to every qualified pharmaceutical house. A maximum price of twenty dollars per pound is fixed as the sale price with a protective pro-

vision for increase based on the Consumer Price Index. Another section would compel Carter to sell the drug to pharmaceutical houses in quantities sufficient for experimental purposes.

Other provisions would enjoin Carter from imposing restrictions upon purchases of the meprobamate compound such as: the uses to which the drug may be put; its resale to others; the prices at which it may be resold; the persons to whom, the areas in which, the prices, terms or conditions at which the compound and combination drugs may be sold; the publication or dissemination by any pharmaceutical house of the results of research conducted by it. The thrust of these injunctive clauses is to prevent Carter from imposing post sales restrictions similar to those now contained in Carter's agreement with American, which the Government assails as going beyond the legitimate rights of a patentee.[2]

Finally, the proposed decree would enjoin Carter from adhering to any provision of its contract with American or any other person which is inconsistent with any provision of the proposed final judgment, and further would require Carter forthwith to terminate and cancel any such inconsistent provision.

While the proposed decree does not abrogate the contract, there can be no question that for all practical purposes it would vitiate the substance of the Carter-American agreement and deprive American of the exclusivity of the meprobamate compound it has enjoyed thereunder. The Government readily acknowledges that such is its intent and effect and that the provision requiring Carter affirmatively to cancel the exclu-

sivity provision is a necessary incident of the decree in order to end the monopolistic position which it asserts has been and is now held by Carter and American and to enable others to compete freely in the sale and distribution of meprobamate and combination drugs.

In opposing the entry of the decree, American perforce asserts the validity of the agreement. It emphasizes that not only will it be deprived of the exclusivity provision—"the heart of the contract for which it bargained"—but that with an authorized maximum price of twenty dollars per pound for the meprobamate compound, as against thirteen dollars which it is presently paying, it will be compelled to pay any differential if Carter should increase the price. Thus, it contends that by the proposed decree Carter unfairly gains an economic advantage at its expense without any judicial determination of the validity of the contract. Accordingly American requests this Court to withhold action until that issue and others posed by the complaint are judicially resolved.

It is desirable that matters be kept in focus. The controversy is not between Carter and American. The essential charge is that both transgressed the antitrust laws and that, in large measure, their agreement was the vehicle whereby they effected their purpose.

In passing upon the joint application of the Government and Carter for approval of their stipulation, the Court performs a judicial function and is called upon to decide whether it is equitable to enter the decree as proposed by them or with necessary modification to effectuate its basic purpose.[3] While the public interest is a dominant

---

2. See United States v. Besser Mfg. Co., 96 F.Supp. 304 (E.D.Mich.1951), aff'd, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952); United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942).

3. See United States v. Swift & Co., 286 U.S. 106, 115, 52 S.Ct. 460, 76 L.Ed. 999 (1932); United States v. Radio Corp. of America, 46 F.Supp. 654 (D.Del.

1942), appeal dismissed, 318 U.S. 796, 63 S.Ct. 851, 87 L.Ed. 1161 (1943); Chrysler Corp. v. United States, 316 U.S. 556, 570, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942) (Frankfurter, J., dissenting).

For some comments upon the usual role of the judiciary in past years in the entering of consent decrees see: Report of the Antitrust Subcommittee of the Committee on the Judiciary, House of

consideration, the rights of third parties may not be ignored. However, the Court is not called upon at this time to adjudicate upon the merits the contested issues posed by the Government's complaint against the nonassenting or assenting defendant; neither is it passing upon the merits of any controversy between the defendants. The issue at this juncture of the case is whether the Court, in the exercise of its equity powers, should, in whole or in part, make the provisions of the stipulation entered into between the Government and Carter a decree of this Court, with the consequence that it is not only binding upon the assenting defendant, but in the event of any violation of its terms it may be enforced against that defendant by appropriate sanctions.

▆▆▆ Generally, if a consent decree will afford substantially the same relief that could be obtained after a hearing upon the merits, such consent procedure should be adopted. It not only redresses alleged violations of antitrust laws, prohibits a continuation of the claimed illegal conduct, and makes available adequate remedy in the event of violations of the terms of the decree, but eliminates time-consuming and expensive trials. While a consenting defendant benefits by avoiding the risk of the prima facie effect of an adverse judgment,[4] the public interest is served by expeditious relief in the elimination of offensive competitive restraints which form the basis of the initial charges. Thus, countervailing considerations of a substantial nature must appear to justify withholding of the requested relief. Accordingly we consider the competing claims of the Government and American.

The Attorney General emphasizes that in end result the decree will correct the noncompetitive and monopolistic situation which he charges has existed in the manufacture, use and distribution of meprobamate compound for the past seven years; that not only will true competition result by reason of the availability of the product to all pharmaceutical houses on a nondiscriminatory basis, but that the maximum price of twenty dollars will enable them, as well as Carter and American, to make a handsome profit and at the same time substantially reduce the price of the tranquilizing and combination drugs to the consuming public.[5]

▆▆▆ These are weighty considerations which the defendant seeks to overcome by its claim that the decree will invade its contract rights without a judicial determination. However, it is hornbook law that any decree which may be entered upon a stipulation to which American is not a party would not be binding upon it. Thus, should the Court act favorably upon the proposed decree, American would retain all its legal remedies as though no final judgment had been entered.[6] It would still be free to assert and defend the validity of the agreement, either in this action or in any other action it may institute against Carter for recovery of damages for breach of the agreement or other appropriate redress of its claimed rights thereunder.[7] While a net effect of the in-

---

Representatives, 86th Cong., 1st Sess. 14–15 (1959) (committee print) and Hamilton & Till, United States Senate Temporary National Economic Committee, 76th Cong., 3d Sess., Investigation of Concentration of Economic Power, Antitrust in Action, Monograph No. 16, p. 88 (1940).

4. 15 U.S.C. § 16 (1958).

5. Upon the hearing it was represented that since publication of the terms of the proposed decree thirty-five pharmaceutical firms have indicated interest in the purchase of the basic compound.

6. See Raylite Electric Corp. v. Noma Electric Corp., 170 F.2d 914, 915 (2d Cir. 1948); General Aniline & Film Corp. v. Bayer Co., 305 N.Y. 479, 113 N.E.2d 844 (1953).

7. The Government has offered to dismiss the action against American without prejudice in the event the proposed final judgment is authorized to eliminate any question that such rights as American may have under the contract remain unimpaired.

junctive provision upon Carter is to withdraw from American the exclusivity benefits of the contract, this is no different from similar provisions which the Supreme Court has upheld in analogous situations to prevent a defendant from performing contracts with third persons who were not parties to the suit.[8]

However, the elimination of the exclusivity provision and the setting of a ceiling price per pound which is in excess of what American is presently charged, does not tell the entire story. The proponents of the proposed decree point out that in some respects it would grant certain advantages to American. It would enjoin Carter from enforcing post sales restrictions imposed under the contract. The decree would remove restraints upon American as to combination drugs it may sell; eliminate the requirement that it pay twenty per cent of its average sales for a three-year period for sales promotion;[9] end the five per cent royalty payment;[10] and limit the price which Carter may charge for the compound.

American's position is further attenuated by another consideration. Apart from the Government's attack upon the contract, it faces a challenge from Carter upon an entirely different ground. Carter contends that the provision that for the duration of the contract American's purchases of the meprobamate compound be paid for "at prices as may be mutually agreed upon" is an agreement to agree and is unenforceable under New York law.[11] American responds that on the basis of established practice it can hurdle this problem. While here

too this Court does not pass upon the merits of the respective contentions, Carter's disavowal of the contract cannot be disregarded as unsubstantial.[12]

Upon balance, the Court is persuaded that there is no just reason for delay and that the decree should be entered at this time. To grant the relief now would immediately eliminate claimed existing violations of the antitrust laws, remove the restraints in the sale and distribution of the drug and bring into play the anticipated benefits to the public. This result would be achieved without impairing American's right to litigate the validity of its agreement in this or any other action where the issue can be judicially resolved upon the merits. The defendant, however, urges that this right would be illusory, since as a practical matter the entry of a decree at this time would deprive it of the benefits of its contract. While it is true that the assertion of its rights means litigation, the fact is that it is presently so involved; moreover, in view of Carter's position as to the unenforceability of the contract under state law, it may be embroiled in further and different litigation. In view of the likely and unpredictable delay pending ultimate determination of the controversies, there is no reason why the benefits of the proposed decree should be withheld while the suits are fought.

In the exercise of discretion, the Court will enter an appropriate final judgment based upon the stipulation of the parties. While the Court does not deem it necessary, but to allay any concern of Ameri-

8. See United States v. National Lead Co., 63 F.Supp. 513, 525 & n. 8 (S.D.N.Y. 1945), aff'd, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947). See generally National Licorice Co. v. N. L. R. B., 309 U.S. 350, 359-367, 60 S.Ct. 569, 84 L.Ed. 799 (1940).

9. During the years 1959 through 1961 this averaged $7,133,000 a year, the equivalent of $11.91 per pound.

10. This is included in the $13.00 per pound which American now pays which, according to it, amounted to $1,900,000 last year.

11. The contract contains a provision that it is to be construed in accordance with the law of the State of New York.

12. See Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 140 N.E. 708, 29 A.L.R. 1325 (1923); Sun Printing and Publishing Ass'n v. Remington Paper & Power Co., 235 N.Y. 338, 139 N.E. 470 (1923); St. Regis Paper Co. v. Hubbs & Hastings Paper Co., 235 N.Y. 30, 138 N.E. 495 (1923). But cf. Outlet Embroidery Co. v. Derwent Mills, Ltd., 254 N.Y. 179, 172 N.E. 462, 70 A.L.R. 1440 (1930).

**150**

ican as to the impact of the judgment upon it, a provision may be included, if American so desires, specifying that in no respect shall the entry thereof be deemed a determination of its rights under the agreement. Such a proposal may be submitted upon five days' notice.