CITIES SERVICE OIL COMPANY *v.* FRANCIS
B. BURCH, ATTORNEY GENERAL OF THE
STATE OF MARYLAND

[No. 4, September Term, 1975.]

*Decided December 30, 1975.*

The cause was argued before MORTON, DAVIDSON and LOWE, JJ.

*John Henry Lewin, Jr.,* with whom were *Benjamin R. Civiletti* and *Venable, Baetjer & Howard* on the brief, for appellant.

*Thomas M. Wilson, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Henry R. Lord, Deputy Attorney General,* on the brief, for appellee.

432

DAVIDSON, J., delivered the opinion of the Court.

On 19 June 1974, Francis B. Burch, the Attorney General of the State of Maryland, filed a bill of complaint in the Circuit Court of Baltimore City against Cities Service Oil Company (Citgo) and Brooks-Huff Tire Company (Brooks), alleging the following violations of the Maryland Antitrust Act,[1] § 38: [2]

1) that Citgo used its economic power over its service station dealers to coerce them to enter into contracts to purchase tires, batteries, and accessories exclusively from suppliers designated by Citgo, thereby unreasonably restraining trade;

2) that Citgo used its economic power over the supply of gasoline to compel its dealers to purchase tires, batteries and accessories, whether wanted or not, from Brooks and other designated suppliers, thereby substantially lessening competition and tending to create a monopoly;

3) that Citgo and its designated tires, batteries and accessories suppliers, including Brooks, established a program of systematic reciprocal purchasing, whereby the suppliers purchased from Citgo a dollar amount of tires, batteries and accessories at jobber prices, equal to the dollar amount of tires, batteries and accessories, which they sold at wholesale prices to their allocated Citgo dealers, thereby unreasonably restraining trade; and

4) that Citgo and the designated tires, batteries and accessories suppliers, including Brooks, vertically allocated and divided the wholesale

---

1. Md. Ann. Code (1957, 1969 Repl. Vol., 1974 Cum. Supp.) Art. 83, § 36 *et seq.* Effective 1 July 1975, the Act was repealed, 1975 Laws of Maryland Ch. 49, § 1, and reenacted as Md. Ann. Code (1975) Commercial Law Article, § 11-201 *et seq.*

2. *See* Commercial Law Article § 11-204.

market of tires, batteries and accessories comprised of Maryland Citgo dealers, thereby unreasonably restraining trade.

In the bill of complaint, the Attorney General sought an adjudication of the illegality of the described practices; injunctions against continuation of the allegedly illegal practices; and, as a prophylactic measure to eradicate the anti-competitive effects of the allegedly illegal practices, injunctions, preventing among other things, Citgo and Brooks from engaging in any business activity or commercial transaction with each other for a period of five years.

On 13 September 1974, Brooks filed an answer in which it denied all of the allegations of unlawful acts. On 16 September 1974, Citgo filed an answer in which, in pertinent part, it denied the allegations of unlawful conduct, and steadfastly maintained that its business activities were completely lawful.

On 1 November 1974, Brooks and the Attorney General stipulated that a "FINAL JUDGMENT AND CONSENT DECREE" should be entered, settling the case between those two parties. The proposed consent decree recited that the parties:

"consented to the entry of this Final Judgment and Consent Decree without trial or adjudication of any issue of fact or law herein, and without this Final Judgment and Consent Decree constituting evidence against or admission by any party with respect to any issue, and without any admission by BROOKS-HUFF of any wrongdoing or unlawful conduct."

It enjoined Brooks from:

(A) entering or continuing any agreement with Citgo whereby Citgo would require or suggest that any Citgo station lessee purchase tires, batteries and accessories from Brooks, for seven (7) years; and

> (B) engaging in any commercial transaction with Citgo for five (5) years.

The decree provided that Brooks could continue to solicit sales from and conduct business with Citgo service station dealers. The decree expressly disavowed any intention to interfere with Brooks' rights and responsibilities in regard to any purchase orders placed with Citgo prior to the execution of the consent decree. Additionally, the decree provided that Brooks would serve a copy of the decree on each Citgo service station dealer and on the Maryland resident agent for the Goodyear Tire and Rubber Company, within 30 days of entry.

On 4 November 1974, a hearing was held by Judge Joseph C. Howard. Citgo, stating that it was then not prepared to present evidence, requested a "full hearing." The parties, including Citgo, presented oral argument on the question of the propriety of the proposed consent decree. On 8 November, all parties filed legal memoranda. On 19 November 1974, the chancellor signed the "FINAL JUDGMENT AND CONSENT DECREE" previously submitted. On 10 January 1975, the chancellor, after making an express determination that there was no just reason for delay, expressly directed the entry of a final judgment upon the claim against Brooks.[3] It is from this final judgment that Citgo appeals.

I

Citgo initially contends that the Maryland Antitrust Act does not authorize the entry of a judgment by consent without a finding by the court that a violation has been committed. In support of its position, it relies upon Art. 83, § 41(1) of the Act [4] which provides:

> "The Attorney General, with such assistance as he may from time to time require of the State's attorneys in the several counties and Baltimore

---

3. Maryland Rule 605 a.
4. *See* Commercial Law Article § 11-209 (a).

City, shall institute proceedings in equity in the circuit court to prevent and restrain violations of § 38 of this subtitle. In such a proceeding, *the court shall determine whether a violation has been committed, and shall enter such judgment or decree as it considers necessary to remove the effects of any violation which it finds, and to prevent such violation from continuing or from being renewed in the future.* The court, in its discretion, may exercise all equitable powers necessary for this purpose, including, but not limited to, injunction, divestiture of property, divorcement of business units, and suspension or termination of the right of foreign corporations or associations to do business in the State of Maryland." (Emphasis added.)

The Attorney General relies upon Art. 83, § 45 of the Act [5] which provides:

"A final judgment or decree rendered in any civil or criminal proceeding brought by the Attorney General under this subtitle to the effect that a defendant has violated this subtitle shall be prima facie evidence against such defendant in any action for damages brought by another party against such defendant under subsection (2) of § 41 of this subtitle,[6] as to all matters respecting which said judgment or decree would be an estoppel as

---

**5.** *See* Commercial Law Article § 11-210.

**6.** Art. 83, § 41 (2) provides in pertinent part:

"Any person who has been injured in his business or property, or is threatened with such injury, by a violation of § 38 of this subtitle may maintain an action in the circuit court for damages, or for an injunction, or both, against any person who has committed such violation. If, in an action for an injunction, the court issues an injunction, the complainant shall be awarded costs and reasonable attorney's fees. In an action for damages, if injury is found to be due to a violation of § 38 of this subtitle, the person injured shall be awarded three times the amount of actual damages resulting from that violation, together with costs and reasonable attorney's fee."

*See* Commercial Law Article § 11-209 (b).

> between the parties thereto: *provided, that this section shall not apply to civil consent judgments or decrees entered before any testimony has been taken."* (Footnote and emphasis added.)

He maintains that this section, which inferentially authorizes the entry of consent judgments or decrees before any testimony has been taken, also inferentially authorizes the entry of such a decree without the finding of a violation.

It is the intent of the General Assembly that in construing the Maryland Antitrust Act courts be guided by the interpretation given by the federal courts to federal antitrust acts.[7]

Section 4 of the Sherman Act,[8] which parallels Art. 83, § 41 (1) of the Maryland Act, provides that:

> "The several district courts of the United States are *invested with jurisdiction to prevent and restrain violations of sections 1 to 7* of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, *to institute proceedings in equity to prevent and restrain such violations.* Such proceedings may be by way of petition setting forth the case and *praying that such violation shall be enjoined or otherwise prohibited.* When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises." [9] (Emphasis added.)

Section 5(a) of the Clayton Act,[10] which parallels Art. 83, § 45 of the Maryland Act provides that:

---

7. Art. 83, § 36; *see* Commercial Law Article § 11-202 (a) (2).
8. 15 U.S.C. § 4 (1970).
9. *See also* 15 U.S.C. § 25 (1970).
10. 15 U.S.C. § 16 (a) (1970).

"A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 15a of this title.*" (Emphasis added.)

Although antitrust statutes do not define or expressly authorize consent decrees which involve neither an admission nor a determination that there has been a violation, federal courts have repeatedly recognized that § 5(a) implicitly authorizes the entry of a consent decree without taking testimony or finding that a violation of the Act has occurred.[11] Indeed, because the entry of a consent decree allows the government to obtain immediate injunctive relief without the expense of litigation, and allows the defendant simultaneously to avoid the expense of litigation and a precedent-setting decision which could be

---

11. *See e.g.,* United States v. Automobile Mfr. Ass'n., 307 F. Supp. 617, 620 (C.D. Cal. 1969), *aff'd. mem. sub nom.* City of New York v. United States, 397 U. S. 248, 90 S. Ct. 1105 (1970); United States v. CIBA, 50 F.R.D. 507, 510, 514 (S.D. N.Y. 1970); United States v. Ling-Temco-Vought, Inc., 315 F. Supp. 1301, 1308 (W.D. Pa. 1970); *United States v.* Carter Products, Inc., 211 F. Supp. 144, 148 (S.D. N.Y. 1962); Callman, The Law of Unfair Competition, Trademarks and Monopolies § 87.1 (d) (1) at 85, n. 57 (1968).

In United States v. Brunswick-Balke-Collender Co., 203 F. Supp. 657, 661-62 (E.D. Wis. 1962), the government refused to sign a consent decree because it omitted any admission or adjudication of guilt. The defendant made a motion to the court to enter the decree nonetheless. The court entered the decree, holding that the defendant had an unqualified right under the proviso to § 5(a) to end the litigation without an adjudication or admission of guilt, which could be used against him in a triple damages action.

used against him in a private antitrust treble damage suit, the great majority of civil antitrust proceedings brought by the federal government culminate in consent decrees.[12]

We are persuaded by federal authority that Art. 83, § 45 of the Maryland Act implicitly authorizes the entry of a consent decree before the taking of testimony and without a finding of a violation of the Act. We now so hold.

II

Citgo next contends that even had the alleged violations been found, the injunction against Brooks would be improper. It maintains that the seven (7) year prohibition against agreements whereby Citgo would require or suggest that any Citgo station lessee purchase tires, batteries and accessories from Brooks, and the five (5) year prohibition against engaging in any commercial transaction with Citgo, impaired Citgo's rights to engage in lawful business activities and were not necessary to remove the effects of violations or to prevent such violations from continuing or being renewed in the future,[13] and indeed would prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest.[14]

The entry of a consent decree is a judicial act,[15] which requires the exercise of discretion. Federal courts have recognized that in approving and entering a consent decree in a civil antitrust case brought by the government, a court must exercise its judgment on the propriety of the relief. Generally, the court should not approve an unenforceable or inequitable decree, one which grants relief inconsistent with the government's complaint, or one procured by fraud or

---

**12.** United States v. Automobile Mfr. Ass'n., *supra* at 621; Lingstrom & Tighe, Antitrust Consent Decrees ix (1974).

**13.** Art. 83, § 41, *supra* pp. 434-35.

**14.** Art. 83, § 36; *see* Commercial Law Article § 11-202 (b) (2).

**15.** United States v. Swift & Co., 286 U. S. 106, 115, 52 S. Ct. 460, 462 (1932).

misrepresentation. The court should approve only those decrees which are in the public interest.[16]

In determining the propriety of an injunction in an antitrust case, the court properly may consider the rights of third parties.[17] Such consideration requires balancing the interests of third parties against the public interest, which may require that even lawful activities affecting third parties be prohibited when necessary to correct the evil effects of unlawful conduct.[18] Considerations substantially affecting third party rights must be shown to justify withholding approval of a consent decree.

This balancing process was described in *United States v. Carter Products, Inc.*[19] There a non-consenting co-defendant in an antitrust action objected to the entry of a final judgment and consent decree against Carter Products, Inc., on the ground that the terms of the decree vitiated an existing contract between the co-defendants "without any judicial determination of [the contract's] validity. . . ." It asked that consideration of any decree be deferred until after a trial on the merits. In approving the decree, the court balanced the public interest against the co-defendant's contract rights. It said:

> "Generally, if a consent decree will afford substantially the same relief that could be obtained after a hearing upon the merits, such consent procedure should be adopted. It not only redresses alleged violations of antitrust laws, prohibits a continuation of the claimed illegal conduct, and

16. United States v. International Tel. & Tel. Corp., 349 F. Supp. 22, 25 n. 2 (D. Conn. 1972), *aff'd. mem. sub nom.* Nader v. United States, 410 U. S. 919, 93 S. Ct. 1363 (1973); Automobile Mfr. Ass'n., Inc., *supra*, 307 F. Supp. at 621; Carter Products, Inc., *supra*, 211 F. Supp. at 148; United States v. Radio Corp. of America, 46 F. Supp. 654, 655 (D. Del. 1942).

17. ITT Corp., *supra*; Automobile Mfr. Ass'n., *supra*; Carter Products, Inc., *supra*.

18. United States v. United Liquors Corp., 77 S. Ct. 208, 210 (1956); United States v. United States Gypsum Co., 340 U. S. 76, 88-89, 71 S. Ct. 160, 169 (1950); United States v. Bausch & Lomb Optical Co., 321 U. S. 707, 724, 64 S. Ct. 805, 814 (1944).

19. 211 F. Supp. 144 (S.D. N.Y. 1962).

makes available adequate remedy in the event of violations of the terms of the decree, but eliminates time-consuming and expensive trials. While a consenting defendant benefits by avoiding the risk of the prima facie effect of an adverse judgment, the public interest is served by expeditious relief in the elimination of offensive competitive restraints which form the basis of the initial charges. Thus, countervailing considerations of a substantial nature must appear to justify withholding of the requested relief. Accordingly we consider the competing claims of the Government and American.

"The Attorney General emphasizes that in end result the decree will correct the noncompetitive and monopolistic situation which he charges has existed in the manufacture, use and distribution of meprobamate compound for the past seven years; that not only will true competition result by reason of the availability of the product to all pharmaceutical houses on a nondiscriminatory basis, but that the maximum price of twenty dollars will enable them, as well as Carter and American, to make a handsome profit and at the same time substantially reduce the price of the tranquilizing and combination drugs to the consuming public.

"These are weighty considerations which the defendant seeks to overcome by its claim that the decree will invade its contract rights without a judicial determination. However, it is hornbook law that any decree which may be entered upon a stipulation to which American is not a party would not be binding upon it. Thus, should the Court act favorably upon the proposed decree, American would retain all its legal remedies as though no final judgment had been entered. It would still be free to assert and defend the validity of the agreement, either in this action or in any other

action it may institute against Carter for recovery of damages for breach of the agreement or other appropriate redress of its claimed rights thereunder. While a net effect of the injunctive provision upon Carter is to withdraw from American the exclusivity benefits of the contract, this is no different from similar provisions which the Supreme Court has upheld in analogous situations to prevent a defendant from performing contracts with third persons who were not parties to the suit." [20]

Upon balance, the court concluded that the consent decree should be approved and entered.[21]

Here the parties agree that Citgo, unlike the non-consenting defendant in *Carter*, does not have a contract with Brooks. Rather, it has a "business relationship" with which the consent decree will interfere. According to Citgo, this relationship generated $113,000 of trade in the first seven months of 1974. In addition, according to Citgo, the Attorney General is proposing "by similar threats of costly litigation, to exact similar five and seven year agreements from all of Cities' tires, batteries and accessories customers ...," thereby destroying Citgo's tires, batteries and accessories business in Maryland, without an adjudication that the Antitrust Act was violated.

What Citgo ignores is that the consent decree is predicated upon correcting the alleged violations of the Act. The seven year prohibition against agreements whereby Citgo would "require" its lessees to purchase tires, batteries and accesssories from Brooks can be construed as necessary to restrain alleged violations of the Act, and the prohibition against agreements whereby Citgo would "suggest" the same can also be viewed as necessary to remove the effects of past alleged violations. In addition, the five year

---

20. 211 F. Supp. at 148-49.
21. United States v. National Lead Co., 63 F. Supp. 513, 525 and n.8 (S.D. N.Y. 1945) *aff'd*, 332 U. S. 319, 67 S. Ct. 1634 (1947). *See also* National Licorice Co. v. N.L.R.B., 309 U. S. 350, 366, 60 S. Ct. 569, 578 (1940).

prohibition against engaging in any commercial transaction with Citgo, which proscribes lawful as well as unlawful activities, can be regarded as necessary to restrain alleged violations and to remove the evil effects of past alleged violations. The prohibition of practices for the purpose of eradicating the evil effects of unlawful conduct cannot constitute a prohibition of "practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest," and is not proscribed by § 36 of the Act.[22]

Moreover, Citgo is not bound by any terms of the decree. Citgo is free during the next five years to carry on its usual business of selling tires, batteries and accessories with any distributor other than Brooks. In addition, Citgo retains any legal remedies it may have against Brooks for interruption of their business relationship. Finally, Citgo reserves its right, in this or any other litigation, to assert and defend the validity of its practices and to prove that its relationships with Brooks and other distributors have no anti-competitive purpose or effect.

Weighing Citgo's alleged economic harm and future irreparable injuries resulting from the existence and operation of the consent decree during Citgo's defense of the litigation still pending, against the public benefit to be derived from prompt redress of the alleged violations of the Act, without a time-consuming and expensive trial, we cannot say that the chancellor abused his discretion in approving and entering the decree. His judgment as to the propriety of the consent decree will be affirmed.

### III

Citgo finally contends that it was denied due process of law because it was not accorded a "full hearing," on the propriety of the decree, as it had requested. We do not agree.

The question of the type of hearing required in an adjudicatory proceeding frequently has been considered.[23]

---

22. *See* Commercial Law Article § 11-202(b)(2).
23. *See* Davis, Administrative Law Treatise §§ 7.01-7.06 (1958).

Courts and commentators have recognized that the submission of evidence is not required to characterize a "full hearing" except where facts are in dispute. In his treatise, Professor Davis states:

> "Of great consequence is the rather elementary proposition that the method of trial is designed for resolving issues of fact, and that the method of argument, not the method of trial, is normally the appropriate oral process for resolving non-factual issues of law and policy and discretion." [24]

To the same effect, a federal Court of Appeals said:

> "Where no genuine or material issue of fact is presented the court or administrative body may pass upon the issues of law after according the parties the right of argument." [25]

Here the essential facts that a substantial business relationship existed between Brooks and Citgo, and that that relationship would be interrupted, were not disputed. The chancellor's determination of the propriety of the consent decree did not depend upon an adjudication of fact, but rather upon the resolution of non-factual issues of law, policy and discretion. Citgo presented oral argument and submitted a legal memorandum. While under other circumstances an evidentiary hearing might be necessary before approval and entry of a consent decree in a civil antitrust case brought by the government, we now hold that under the present circumstances, such an evidentiary hearing was not required.

*Judgment affirmed.*
*Costs to be paid by appellant.*

---

24. *Id.* at 409.
25. Producers Livestock Marketing Ass'n. v. United States, 241 F. 2d 192, 196 (10th Cir. 1957), *aff'd. sub nom.* Denver Union Stock Yard Co. v. Producers Livestock Marketing Ass'n., 356 U. S. 282 (1958); *accord* Persian Gulf Outward Freight Conference v. Federal Maritime Com'n, 375 F. 2d 335, 340-41 (D.C. Cir. 1967).