**UNITED STATES of America**

v.

**LING–TEMCO–VOUGHT, INC., Jones & Laughlin Steel Corporation and Jones & Laughlin Industries, Inc.**

**Civ. A. No. 69–438.**

United States District Court,
W. D. Pennsylvania.

June 10, 1970.

See also 49 F.R.D. 150.

**1302**

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Rose, Schmidt & Dixon, Pittsburgh, Pa., Arnold & Porter, Washington, D. C.,

Dan Burney, Dallas, Tex., for Ling-Temco-Vought, Inc.

Edward C. Ford, Robert B. Peabody, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Jones, Day, Cockley & Reavis, Cleveland, Ohio, for Jones & Laughlin Steel Corp. and Jones & Laughlin Industries, Inc.

Ashton & Stitt, Pittsburgh, Pa., for Local 1843 United Steelworkers.

### OPINION

ROSENBERG, District Judge.

The United States of America, the plaintiff, acting through its Department of Justice, filed a complaint in the above entitled case against the defendants, Ling-Temco-Vought, Inc. (LTV), Jones & Laughlin Steel Corporation (J & L) and Jones & Laughlin Industries, Inc. (JLI) and sought an adjudication that the defendants were in violation of § 7 of the Clayton Act; that the defendants LTV and JLI be directed to divest themselves of all ownership interests in J & L and that in connection therewith injunctive processes issue.

The action asserted jurisdiction in this Court under § 15 of the Clayton Act, 15 U.S.C. § 25[1] and § 7 of the same Act, 15 U.S.C. § 18.[2]

The defendant LTV is a Delaware corporation having its principal place of business in Dallas, Texas; the defendant J & L is a Pennsylvania corporation which has its principal place of business in Pittsburgh, Pennsylvania, and the defendant JLI is a Delaware corporation

---

1. 15 U.S.C. § 25. "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of this Act, and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. * * * and pending such petition, and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises. * * * " Oct. 15, 1914, c. 323, § 15, 38 Stat. 736; June 25, 1948, c. 646, § 1, 62 Stat. 909.

2. 15 U.S.C. § 18. "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. * * * " Oct 15, 1914, c. 323, § 7, 38 Stat. 731; Dec. 29, 1950, c. 1184, 64 Stat. 1125.

having its principal place of business in Dallas, Texas. The parties have stipulated that all defendants were transacting business within the Western District of Pennsylvania at the time the suit was commenced and service and venue were proper.

Through a series of offerings to the holders of J & L common stock, LTV through the intermediary of its subsidiary JLI had acquired in excess of 81.4% of the outstanding common stock of J & L.

The parties originally entered into and agreed upon a preliminary injunction which I approved and directed to be filed. Following that the parties commenced discovery procedures and during the course of such procedures arrived at an agreement for finally determining the entire action. The matter was presented to me by a stipulation and a suggested decree. I directed that the stipulation and proposed decree be filed, and because no evidence was presented in support of such decree, and for my guidance in evaluating such a decree, I scheduled an open public hearing for June 1, 1970 for the purpose of determining whether the settlement entered into between the parties in their proffered decree was in the public interest.

In the interim dozens of letters were sent to me by interested persons. Such letters were ordered filed and made a part of the record. The hearing on June 1st was attended by a large group of persons and those individuals who desired to be heard were given an opportunity to do so. I find that those who communicated their feelings either by letter or in the courtroom may be categorized generally as:

(a) those persons who are owners of LTV stock and have been severely affected financially because of the decline in the market price of LTV stock and who, for the most part, condemn the Justice Department as inter-meddling in the free enterprise activities of LTV;

(b) those persons who own stock or are investors in debt securities of J & L and who condemn LTV for its self-serving efforts in acquiring control of a corporation such as J & L and who fear that LTV will divert J & L's assets for the advantage of various other holdings;

(c) those pensioners and prospective pensioners under the J & L pension plans who are apprehensive of LTV's possible diminution of the accumulated trust assets; and

(d) Those employees of J & L who for the most part are concerned with possible disruption of their employment security and their employment rights, particularly unemployment and pension benefits as a result of the acquisition of LTV.

Practically all of these persons complained bitterly of the precipitous decline in the stock market values of LTV and J & L stocks and bonds or debentures and charged either the Government or LTV with blame for the rapid decline in value of these securities during 1969, and particularly in 1970. None of these individuals appear to have taken into consideration that the securities market in general has shown a severe decline during the same time.

From the letters I received and the presentation of those who attended the hearing, I have been shown the effect of this acquisition upon individual persons. I realize that there were heavy investors in LTV who have seen their fortunes reduced, as in the case of one individual who had 50,000 shares of stock which at one time was valued at $168.00 per share and is now quoted at $8.00 per share. Other individuals, who had purchased securities of J & L, particularly as a nest egg to guarantee them an income in their advanced years, have also suffered diminution in these resources. While considering all of these unfortunate circumstances it is my function to presently make a determination in accordance with the provisions of the Clayton Act and to best effectuate the public welfare.

Because the parties had not presented evidence upon which to base a determi-

nation that the United States District Court for the Western District of Pennsylvania had jurisdiction, and particularly the power to retain jurisdiction for a period of ten years as requested in the proposed decree, on April 10, 1970. I directed the parties to present supports by way of affidavits, stipulation, or other evidence, upon which I might base the requested decree.

The parties had previously filed a stipulation of certain facts on October 24, 1969, and pursuant to my order of April 10, 1970 filed a Stipulated Statement of Facts on May 8, 1970. From all of the evidence as a whole thus submitted to me, I make the following findings of fact:

That the jurisdiction of this case is vested in the United States District Court for the Western District of Pennsylvania;

That notice of these proceedings was duly made upon all the defendants in this case;

That on May 14, 1968, LTV offered to purchase for cash outstanding common stock of J & L for $85.00 per share, while at the same time, at or near that time, the market price of the common stock of J & L on the New York Stock Exchange ranged from a low of $51.875 to a high of $55.75;

That as a result of the offer, LTV acquired approximately 63% of the shares then outstanding, for approximately $425,000,000;

That on January 21, 1969, LTV caused JLI to be incorporated under the laws of the State of Delaware, and on March 13, 1969, LTV transferred to JLI all of the shares of the common stock of J & L owned by it in exchange for certain shares of common stock and certificates of indebtedness obligations, and that on March 17, 1969, became the owner of all outstanding stock of JLI;

That on March 17, 1969, JLI offered the public stockholders of J & L in exchange for each share of such stock: (a) $42.50 principal amount of 6¾% subordinated debentures of JLI due in 1994; (b) ⅒th share of common stock of JLI, and (c) ½ warrant expiring April 1, 1979, to purchase JLI common stock at $37.50 a full share, and thereafter JLI acquired additional shares of J & L common stock;

That as a result of these transactions, directly and indirectly, LTV holds approximately 81% of the common shares of J & L;

That LTV, JLI and J & L are all engaged "in commerce" within the meaning of § 7 of the Clayton Act;

That LTV, a highly diversified company, as of April 14, 1969, was engaged, through its operating subsidiaries, in a variety of businesses, including the manufacture and sale of fighter planes and aerospace equipment, copper wire, sporting goods, meat products, chemical and pharmaceutical products, electronic equipment, carpeting products, and steel and steel products;

That it also controlled one of the nation's major commercial airlines, Braniff Airways, Incorporated (Braniff) and one of the country's three major car rental firms, National Car Rental System, Inc.;

That in 1969, the combined revenues of all of LTV's operating subsidiaries were approximately $4 billion, and the book value of the assets of those subsidiaries was approximately $3.3 billion as of December 31, 1969;

That J & L is a fully integrated steel company which produces most basic steel products and accounts for approximately 6% of national steel shipments;

That in 1969, J & L's total sales were approximately $1 billion and the book value of its assets was approximately $1.2 billion as of December 31, 1969;

That through a series of negotiations with its employees or their union representatives, and commencing in the 1950's, J & L committed itself to a series of employee pension and benefit plans for its employees and pensioners, and supported these plans by monetary grants;

That the execution of these employee pension and benefit plans and their ad-

ministration was left in the ultimate control of J & L;

That Braniff is one of the nation's major commercial airlines in which LTV in 1968 acquired 66% of its outstanding common stock, and as of the present time LTV owns approximately 55% of the equity stock of Braniff;

That the total revenue of Braniff in 1969 was aproximately $325 million, and the book value of its assets was approximately $376 million as of December 31, 1969;

That Braniff purchases substantial quantities of jet fuel from oil producers and refiners who are actual or potential purchasers of steel products manufactured by J & L, and that Braniff also purchases aircraft which incorporate components that are or can be manufactured by a subsidiary of LTV—LTV Aerospace, Inc.;

That The Okonite Company (Okonite) is a non-integrated producer of copper wire and also produces various types of insulated copper and aluminum cable and manufactures mining cable for which J & L is an actual or potential customer in connection with the operation of its mining properties, and it also manufactures and sells a variety of carpeting products;

That in 1968 Okonite acquired General Felt Industries, Inc., a manufacturer of carpet products, which thereafter became an operating division of Okonite;

That Okonite's sales were approximately $204 million, and the book value of its assets was approximately $181 million as of December 31, 1969;

That more recently LTV has become the owner of all of the common stock of Okonite;

That the iron and steel industry is a highly concentrated oligopoly of which eight fully integrated steel companies have accounted for over 75% of the industry's total net shipments of steel products;

That the economies of scale in the production of steel are such that integrated steel plants must be large in size and therefore require very large capital investment, and thus the barriers to entry into the iron and steel industry as a fully integrated producer or as an integrated producer are high;

That in 1935 to the present time only two companies have entered into the iron and steel industry as fully integrated producers with newly constructed production facilities—Kaiser Steel Corporation and Lone Star Steel Company;

That since 1935 six of these companies which were semi-integrated or non-integrated became integrated by adding to their facilities by new construction or by merger, although one of these has since discontinued steel production;

That in combination the other five companies accounted for 4.4% of the industry's total net shipments in 1968, the largest of these, McLouth Steel Corporation, accounted for 1.3% of such shipments;

That the fully integrated steel companies begin the manufacture of steel from iron ore, coal and limestone, supplied in varying degrees from their own mines and quarries, and in the manufacturing process they operate coke ovens, blast furnaces, steel making furnaces and rolling and finishing facilities;

That some of the integrated steel companies are further integrated into the manufacture of fabricated products and into the distribution of steel and other products through steel service centers and oil field equipment supply stores;

That the semi-integrated companies purchase pig iron or steel scrap, from which they manufacture steel;

That the non-integrated companies purchase steel and begin their manufacturing operations with the rolling of steel;

That as of 1960, the integrated companies owned approximately 90% of the industry capacity in each branch of the industry (coke, blast furnace, steel ingots, and finished hot rolled products);

That the smaller non-integrated and semi-integrated companies are dependent upon others, including the integrated steel companies, as sources of supply for raw materials and cater to the demands of steel consumers in local consuming centers or supply specialty products which cannot be as easily supplied by the large integrated companies whose primary activity is the production of standard tonnage items in high volume;

That the steel industry looks to the integrated companies for most of the basic raw materials on which the continued operation of the steel industry depends, and those companies must be constantly on the search for new sources of raw materials and find the vast amounts of capital required in connection with the obtaining and processing of such raw materials and for the production of pig iron, steel and basic steel products in immense tonnages;

That there has been relatively little effective price competition in the iron and steel industry in recent years;

That the mill price for each steel product is usually identical from company to company with United States Steel Corporation having been the price leader in the industry, with the result that its pricing policy has most commonly influenced the price pattern for the industry generally;

That this action is one of several cases brought by the Department of Justice predicated in part on its claim that § 7 of the Clayton Act prohibits the acquisition by large conglomerate corporations in the course of, and which tend to proliferate, a merger movement where concentration of control of manufacturing assets will be substantially increased and the trend to further concentration will be encouraged;

That subsequent to the filing of the complaint LTV disposed of its entire interest in its subsidiaries Wilson Sporting Goods Co. and National Car Rental System, Inc., the book value of whose combined assets exceeded $156 million as of December 31, 1968;

That as the alternative is presented for the divestiture of Braniff and Okonite or of J & L interests, a divestiture of more than $500 million of assets is involved;

That discovery procedure up to the time when the settlement negotiations began required the turn over to the plaintiff of more than 36,000 pages of documents and the conduct of depositions totaling more than 4,400 pages of oral testimony transcript, while the defendants discovery was far from complete; and

That the procedure particularly as it related to a final decree received wide publicity with notice to interested parties.

Thus, the parties have arrived at a settlement of their differences and it becomes unnecessary for me to detail the contentions of the parties on the issues as they were presented in the pleadings. It is sufficient only that I state that this action was commenced by the Government pursuant to the Acts of Congress against the acquisition by LTV of J & L stock because of the conglomerate holdings which LTV had as of the time of the instant acquisition, and because of the impact which such an enlargement of conglomerate holdings might have upon the competitive economy involved, as well as the potential reciprocity which a conglomerate set up of this character might generate.

For the purpose of procuring the court's aid, first as to the approval of the decree, and second for adopting it, the Government asserts that the proposed decree reflects the Justice Department's view that Congress in enacting § 7 was deeply concerned with the problem of economic concentration in the American economy and particularly with the trend toward an increase in such concentration by external expansion of businesses through mergers, acquisitions and consolidations. It thus urges that the decree "will be effective to implement the Congressional purpose to stem the tide toward increased economic concentration in the United States economy and will be a significant deterrent

against other very large acquisitions by conglomerate firms—a phenomenon which as economic reports disclose, has increasingly characterized the accelerating merger trend in the United States in recent years."

The Government further declares that the relief which the decree will insure conforms to the belief of the Department of Justice that the Congressional intent was to prevent undue concentration of economic power through conglomerate acquisitions as well as those which are vertical or horizontal in character.

Counsel for the Government says "The relief which the proposed judgment would afford in this regard is consistent with the main theories upon which the action was instituted and, in particular, with the Congressional purpose underlying Section 7 of the Clayton Act 'to eliminate future increases in the level of economic concentration resulting from corporate mergers and acquisitions.'" S.Rep. #1775, 81st Cong., 2nd Sess. 3 (1950), U.S.Code Congressional Service, p. 4295.

The submitted decree contains provisions that until the divestiture is completed, LTV cannot use J & L assets for its own purpose and accordingly sets up certain detailed prohibitions which would effectively prevent LTV from liquidating any of J & L, Braniff or Okonite assets to resolve any financial problems that LTV might have between the time judgment is entered and the divestiture actually accomplished. The purpose, it is stated, is to prohibit any sort of piecemeal disposition, liquidation, or cannibalization of presently operating companies, with certain exceptions requiring governmental approval. The decree would also prohibit LTV and J & L from acquiring any interest in excess of 1% in any corporation which has assets in the amount of $100 million without first obtaining the consent of the government or of the court. The purpose of this provision, it is stated, is to prevent, without government or court approval, the defendants from engaging

in the acquisition of any of the very large corporations in America and thus increase economic concentration.

The submitted decree provides guards against the defendants engaging in the reciprocity or seller's practice of utilizing the volume or potential volume of its purchases to induce others to buy its purchases by other companies. The complaint as originally filed by the Government asserted that the enhanced opportunity for reciprocity practices resulting from the acquisition increased the probability of anti-competitive effects. The proposed final decree prohibits such reciprocity practices for a period of ten years and further provides protective measures to insure against anti-competitive reciprocity practices, policies or arrangements. The decree also attempts to insure the effectiveness of these anti-reciprocity provisions by requiring each defendant to cause each of its principal domestic subsidiaries to file with the court a submission to jurisdiction and its consent to be bound by these provisions which prohibit reciprocity practices.

The parties urge the adoption of the submitted decree in order to bring the litigation to a speedy termination, thus avoiding the anticipated delay, uncertainty and expenses, to the Government and to the defendants which would be otherwise involved in the full scale litigation of this case upon the merits in the trial court.

The decree which I am asked to enter fashions a vehicle by which the Department of Justice is vested with a certain amount of supervisory controls over the functions of LTV for the next ten years; and for the next three years LTV is granted an option of either retaining J & L and divesting itself of Okonite and Braniff, or in the alternative of divesting itself of J & L and retaining Okonite and Braniff. The assets of J & L are somewhat greater than twice the value of the assets of Okonite and Braniff combined. Each of the three holdings are in themselves unconnected industries.

For the reasons acceptable to the Department of Justice, either divestiture in accordance with the option would not violate the provisions of the Clayton Act. The real advantage which would accrue to the Department of Justice, it is asserted, is the submission by LTV to supervision by the Department of Justice in order to assure the Government that there would be no violation of the Clayton Act within the next ten year period.

It would seem to me that any divestiture should not be prolonged for a period of three years but should be done immediately in accord with the decisions of our Supreme Court. Cascade Nat. Gas v. El Paso Nat. Gas, 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967); United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); United States v. El Paso Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed. 2d 12 (1964).

The Government argues in this connection that "the three year period of time within which the divestiture is to be completed under the terms of the proposed consent final judgment will, in all probability, result in an earlier divestiture than would be accomplished if the case were fully litigated and resulted in a judgment for the Government on the merits." I conclude, however, that the Department of Justice has agreed to the three year period for the purpose of permitting LTV to balance and stabilize its affairs because of the fact that the LTV financial structure is complex and holds the fate of a large number of employees as well as many thousand investors. I have had no evidence presented to me on this phase other than the many letters which I received and of those witnesses who appeared in court with hearsay evidence upon which I may speculate, but not make any findings of fact relevant to a determination here.

But because the parties have filed their stipulation and submitted a decree upon which they have agreed, I am relieved of the necessity of making certain findings of fact and conclusions of law which I would ordinarily be required to do if the action proceeded in adversary fashion. And this is so in view of the fact that Congress has obviously anticipated the times when the United States would enter into consent decrees with some of those whom, it prosecutes under the antitrust laws.

 Congress has made provisions under § 5(a) of the Clayton Act for the effect which is to be given to consent decrees when such are arrived at before testimony is undertaken.[3] In foreseeing the use of consent decrees to settle antitrust litigation, Congress obviously considered the desirability of avoiding long drawn-out litigation. United States v. Automobile Manufacturers Ass'n, 307 F. Supp. 617 (D.C.Cal.1969), affirmed 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970); United States v. Carter Products, Inc., 211 F.Supp. 144 (S.D.N.Y. 1962). Therefore the consent decree does have a proper place in the prosecution of antitrust cases by the Government. An agreement or stipulation filed by the United States and those whom it prosecutes becomes a judicial act only when it is so decreed by the court in which the action is brought. But it should not be effected without judicial inquiry. "It is a judicial function and an exercise of the judicial power to render judgment on consent", Pope v.

---

3. Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a) provides that, "A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws * * * as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided*, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 15a of this title."

United States, 323 U.S. 1, 12, 65 S.Ct. 16, 22, 89 L.Ed. 3 (1944). When the court approves such a decree it becomes the adjudication of the court. Brunswick Corporation v. Chrysler Corporation, 408 F.2d 335, C.A. 7, 1969. Thus, while an agreement between parties can facilitate and advance a judicial determination which would, otherwise, be arrived at in an adversary proceeding, I am nevertheless not relieved from examining the same and inquiring into any matter which in equity should have been considered had the matter proceeded in adversary fashion.

 Where, as here, the subject matter of the litigation concerns the public interest and its economy, and where, as here, I have not been provided with a complete record upon which I can rest a determination, I must obviously place weight upon the stipulation of the parties and particularly the assurance of the Department of Justice that its participation in the settlement and its recommendations to me are strictly in accord with the Congressional scope of the subject matter. With the acceptance by the parties of a plan which permits the defendant LTV to proceed with a modified version of the originally undertaken acquisition of J & L, the private interests are resolved but " * * * the public interest in preserving a free-competitive economy cannot be outweighed by any private interest." United States v. Ingersoll-Rand Company, 218 F.Supp. 530 (W.D.Pa., 1963), aff'd. 320 F.2d 509, C.A. 3, 1963.

I received numerous letters from employees and pensioners of J & L and of the Presidents of two Unions of United Steelworkers of America, the first dated March 26, 1970 from Local 1843 at Pittsburgh, Pennsylvania, and the second dated May 28, 1970 from Local 4793 at Ishpeming, Michigan, expressing deep concern with the effect which the proposed judgment will have on the various pension and employees' plans, as well as possible employment aspects. In the first letter, President Frank W. O'Brien stated that "[o]ver forty thousand employees would be affected by this action. Ten thousand in the Pittsburgh Works would be affected." He said that there are twenty-one hundred persons on pension in the Pittsburgh Works at the present time, and that hundreds of employees have vested pension rights under labor agreements. In the second letter, President Jim Sodergren stated that "225 hourly employee's are soon to qualify for a pension." The concern is expressed that the mine would be closed by LTV or sold to mining interests. The mine ships iron ore.

Prior to the acquisition of the J & L stock by LTV, certain rights had been created for the benefit of their employees and pensioners of J & L and its subsidiaries. This group of individuals have in most instances given long years of service to J & L and its subsidiaries and undoubtedly have done so in reliance upon employment protections and pension benefits. It is for the preservation of these rights created by benefit plans to which I direct the specific attention of the parties. These plans or their subsequent modifications and amendments, marked as exhibits by counsel for J & L, and admitted into evidence, comprise a series of contract and trust agreements. After examining these I find that the administration of these agreements is left with J & L and that the possession of the trust fund is in the hands of the Trustee, Mellon National Bank and Trust Company, who was appointed by the Board of Directors of J & L and who also is subject to removal upon proper notice by the Board of Directors of J & L.

I have no information before me on what the amount of the funds are, how they are constituted, or how much is presently protective of the rights for which the agreements have been entered into and accepted by J & L. Since the requested decree provides for certain powers of participation by LTV in J & L control, I must regard as an element of public concern the rights of employees and pensioners in the funds and that these be preserved in accordance with the spirit of the agreements. This is so in

spite of the fact that the proffered decree denies LTV certain controls until the merger has been effected.[4] I particularly emphasize the fact that because of the right of the trustee to invest in stocks, it is possible that it might invest in securities of LTV or any of its corporate holdings, thereby producing an advantage to LTV if this were done.[5] It is my belief that the trust funds should remain inviolate and LTV denied controls over them, not only until the merger has been effected, but also for so long as the purposes of the plans and trust funds contemplate. As relates to the agreements which may be terminated, the basis for such termination would be a matter of public concern and merits judicial protection as long as jurisdiction remains here.

■ On June 1st Mr. O'Brien followed through with a Petition to Intervene but moved through counsel for the withdrawal of the same on the basis that there had been meetings between him and James J. Ling, President and Robert Stewart, III, Chairman of the Board, who had given assurance of a course of conduct designed to protect the integrity of the various funds. This was followed by a letter which was read into evidence, but not formally made a part of the record, in which Mr. Ling made this assertion, "With respect to pension fund, supplemental unemployment benefits and similar matters, it is my intention and policy that there shall never be any violation of any contractual, trust fund or other legal rights of these persons which must be protected." Accordingly, the proposed final judgment will be entered upon the parties' submission forthwith of an undertaking acceptable to me which provides safeguards to the employee benefit and pension funds involved.

Other matters here presented by way of letters and by objectors at the hearings on June 1st are for the most part conjectural. Many letter complaints received, alleged that because of the acquisition by LTV of the J & L stock, J & L directors at their last meeting passed a quarterly dividend for the first time in years, causing financial difficulties for persons who relied upon such income. This failure to pay a dividend was for the most part blamed on LTV because of its ulterior motives. For whatever reason the dividend was passed, it may or may not give the J & L minority stockholders some satisfaction in knowing that if a dividend had been voted more than 80% of it would have been paid to LTV for whatever purposes it chose to use such funds. As is, such funds remain within the control of J & L for such capital utilization as should benefit the minority as well as the majority stockholders.

■ One stockholder whose holdings were greater than those of some of the J & L officers, attempted to show that the present officials of J & L were actually the puppets of LTV and that they were acting without respect to the interests of the minority stockholders. This was denied by all counsel, and particularly by counsel for the Government, who indicated that LTV had no controlling power over the affairs of J & L during the pendency of the preliminary injunction. Whatever the circumstances in this instance, there is no question that the rights of the minority stockholders should be protected, but these are not matters which can properly be treated here. The rights of the minority stockholders should be preserved in the future by such proceedings as were available to them prior to

4. Section IV(E) of the proposed decree provides inter alia that neither J & L nor LTV shall impair the viability of any businesses to be divested nor perform any extraordinary acts with the assets of any of the companies to be divested.

5. It would seem that since the trustee is removable at the discretion of the Board

of Directors of J & L that once control was procured by LTV in the government and administration of J & L affairs that pressure could be brought to bear upon the Directors to invest in LTV holdings which it may now control or in the future acquire.

and as of the time of the acquisition of the J & L stock by LTV. Accordingly, in the adoption of the decree I do not exercise any jurisdiction which will preclude a state court from enforcing remedies of stockholders or security holders where such are properly brought in accordance with law.